THE PEOPLE *ex rel.* NEIL F. HARTIGAN, Attorney General, Plaintiff-Appellee, v. THE DYNASTY SYSTEM CORPORATION *et al.*, Defendants-Appellants.

Fourth District    Nos. 4—84—0337, 4—84—0414 cons.

Opinion filed November 15, 1984.—Rehearing denied December 12, 1984.

Stine & Wolter, P.C., of Springfield, and Thayer C. Lindauer, of Phoenix,

Arizona, for appellants.

Neil F. Hartigan, Attorney General, of Springfield (John G. Abrell and Scott D. Spooner, Assistant Attorneys General, of counsel), for appellee.

PRESIDING JUSTICE MILLS delivered the opinion of the court:
Pyramid sales scheme.
TRO and preliminary injunction issued.
Interlocutory appeal.
We affirm.
The Dynasty System Corporation (TDSC), R. Keith Julian, Pat Julian, and Rachel McClelland—defendants here—bring this interlocutory appeal from denial of their motion to vacate a temporary restraining order and to vacate a preliminary injunction enjoining them from marketing TDSC's products and services.
We affirm.

### I. FACTS

The record discloses that TDSC is a Texas corporation,. R. Keith Julian and Pat Julian are the founders and sole shareholders of TDSC, and Rachel McClelland is a TDSC distributor who resides in Quincy, Illinois.

TDSC is a multilevel sales corporation which markets its products and services throughout the United States. Its sales program is designed both to sell its products and services and to recruit new distributors. A TDSC distributor may purchase the products and services for personal consumption or for resale to third parties. A distributor earns commissions on products and services purchased by other TDSC distributors he recruits into the "Dynasty System" and by those his recruits in turn recruit.

Each distributor is thus encouraged to develop a "down-line" organization by sponsoring other distributors into the System. Ideally, each distributor would recruit four individuals into the System, and each of them would recruit four additional persons, until the original distributor has a down-line organization consisting of seven levels and comprising 16,384 persons. A distributor only receives commissions on purchases of products and services by those distributors within his down-line organization.

TDSC's marketing operation consists of *five programs*. Under the *first* program, a person becomes a "Dynasty distributor" and may sponsor other distributors. Under a *second* program—Dynasty System I—"free enterprise"—a person becomes a distributor in other multi-

level sales companies recommended by TDSC. One of the two companies presently recommended by TDSC is a company wholly owned and operated by the Julians. These companies also pay commissions on products purchased by persons in the distributor's down-line organization.

A *third* program—Dynasty System II "The Master Achiever's Club"—offers a personal development course consisting of a series of 12 motivational tapes. The cost of this program is $70 per year. The *fourth* program—"Executive Management Information Service"—offers a monthly computer report of the recruitments and purchases of distributors in a participant's down-line organization. The fee for this service is $80 per month.

Upon sponsoring one additional participant, a distributor gains entry into the *fifth* program—Dynasty III, "The Millionaire's Circle." This entitles the entrant to enlist the aid of a computer service in filling their down-line organization with the System's extra recruits.

On April 24, 1984, the Attorney General of Illinois filed a multicount complaint against the defendants alleging that TDSC's multilevel sales program constituted common law fraud, an illegal lottery, a pyramid sales scheme, and a chain referral sales technique. The Attorney General requested a temporary restraining order (TRO), a preliminary injunction, a permanent injunction and civil penalties.

After an *ex parte* hearing at which the court heard the testimony of the Attorney General's witness, the trial court issued a TRO enjoining the defendants from "advertising for sale, offering for sale, or selling multi-level goods and services, by or through the Defendant 'The Dynasty System Corporation.'" The TRO was to be effective for nine days, and the court set a hearing on the Attorney General's motion for a preliminary injunction on the day the TRO was to expire. On May 2, 1984, the defendants filed a motion to vacate the TRO.

An evidentiary hearing regarding the defendants' motion to vacate the TRO and the Attorney General's motion for a preliminary injunction was held on May 2, 1984. The evidence offered by the Attorney General indicated that the various programs offered by TDSC were marketed as an entire system. Each witness who testified had participated in all of the programs and had made an initial investment of $256. Several of the products ordered and paid for by the distributors had never been received. Testimony also indicated that some of the products were of inferior quality and that others were not competitively priced.

The primary emphasis in the Dynasty System was placed upon recruiting other participants into the System in order to build a down-

line organization, and little emphasis was placed upon retail sales of the products and services. None of the distributors testifying for the Attorney General had recruited an additional participant, nor had any of them made a retail sale of the products or services they had purchased.

The trial court denied the defendants' motion to vacate the TRO and issued a preliminary injunction enjoining the defendants in the same manner as the TRO.

In issuing the preliminary injunction, the court stated that the Attorney General had shown that the defendants' activities may constitute a pyramid sales scheme. The defendants then filed interlocutory appeals from both orders. The cases were consolidated on appeal.

## II. ANALYSIS

The defendants raise the following issues on appeal: (1) Whether their activities may constitute a pyramid sales scheme; (2) whether they were erroneously held liable for the acts of other TDSC distributors; (3) whether the pyramid sales scheme statute is unconstitutional; and (4) whether the Attorney General was required to prove the traditional common law requirements for an injunction.

## PYRAMID SALES SCHEME

■■ The first issue to be considered on appeal is whether the evidence presented at the hearing on the Attorney General's motion for a preliminary injunction established that TDSC's activities may constitute a pyramid sales scheme in violation of the Consumer Fraud and Deceptive Business Practices Act (the Act) (Ill. Rev. Stat. 1983, ch. 121½, par. 262A(2)).

Section 1(g) of the Act (Ill. Rev. Stat. 1983, ch. 121½, par. 261(g)) defines a pyramid sales scheme to include:

"[A]ny plan or operation whereby a person in exchange for money or other thing of value acquires the opportunity to receive a benefit or thing of value, which is primarily based upon the inducement of additional persons, by himself or others, regardless of number, to participate in the same plan or operation and is not primarily contingent on the volume or quantity of goods, services, or other property sold or distributed or to be sold or distributed to persons for purposes of resale to consumers."

TDSC contends that its activities do not constitute a pyramid sales scheme because the Act requires that a person exchange money or other value for the right to benefit. TDSC argues that, under its

programs, a person may become a "Dynasty distributor" without purchasing any products or services. TDSC points out that, due to a change in its policies effective April 1, 1984, a Dynasty distributor earns maximum commissions from purchases of products by distributors in his down-line organization without regard to his participation in the System. Prior to this change, a participant would not earn the full amount of the commission unless he purchased a minimum amount of products from the affiliated companies, the tapes and the computer reports each month. We do not, however, find this change in policy to be determinative.

An argument similar to that made by the defendants here was considered and rejected by the North Carolina Court of Appeals in *State ex rel. Edmisten v. Challenge, Inc.* (N.C. App. 1981), 54 N.C. App. 513, 284 S.E.2d 333. The North Carolina statute defined a pyramid distribution plan as " '*** any program utilizing a pyramid or chain process by which a participant gives a valuable consideration for the opportunity to receive compensation or things of value in return for inducing other persons to become participants in the program; ***.' " (54 N.C. App. 513, 516-17, 284 S.E.2d 333, 336.) The defendants argued that their activities did not constitute an unlawful plan because an "Independent Sales Agent" need not purchase any products or services in order to earn commissions from the recruitment of new sales agents. In rejecting the defendants' argument, the court held that the statute is violated if an individual pays consideration, whether or not he is required to pay it.

Following the rationale of the court in *Edmisten*, we hold that whenever a person exchanges money for a right to benefit in a pyramid sales plan, it is irrelevant whether he is required to do so. All of the TDSC distributors who testified at the hearing had paid money to participate in TDSC's programs. Testimony also indicated that almost all of 269 distributors in Illinois had paid money to TDSC or its affiliated companies.

■ Thus, in view of our interpretation of the statute, TDSC's change in policy does not affect its liability under the Act. It is apparent that the success of the Dynasty System is incumbent upon the continued participation by all of its members. The upward flow of commissions would come to an abrupt halt if the participants failed to make their monthly purchases. Active recruitment and continued participation were portrayed as the "Dynasty Way."

■ The defendants also argue that the evidence fails to show that the benefits received by TDSC distributors are primarily based upon the inducement of others to participate and are not primarily

contingent on the volume of goods sold to persons for purposes of resale to consumers. We disagree.

The evidence overwhelmingly demonstrates that the primary emphasis is on commissions earned by building a down-line organization. Testimony established that TDSC was represented as a consuming organization and not as a selling organization. Commissions are not dependent upon retail sales to ultimate consumers, but are paid solely upon purchases made by distributors in the participant's down-line organization.

Although TDSC maintains that the Dynasty II tapes and the Executive Management Computer Reports are marketable products, none of the distributors testifying at the hearing had made a single sale of either item. A similar situation was before the court in *Dare To Be Great, Inc. v. Commonwealth ex rel. Hancock* (Ky. 1974), 511 S.W.2d 224, where the court considered a scheme involving the sale of a series of motivational tapes through distributorships. The court stated that the scheme constituted a fraudulent and deceptive trade practice and that the purpose of the tapes was to provide the defendant with "a flimsy and transparent claim of legitimacy for their fraudulent enterprise." 511 S.W.2d 224, 226.

In their brief, the defendants acknowledge the current lack of retail sales but argue that the System's operation cannot fairly be judged in its infancy. The defendants claim that as the distributorship network expands, retail sales will also expand. The statute, however, does not provide any dispensation for start-up activities, and we decline to create one.

In sum, we believe that the Attorney General established that TDSC's activities may constitute a pyramid sales scheme as defined by the Act.

■ Because of this conclusion, we also reject the defendants' contention that they were erroneously held responsible for the acts and omissions of other TDSC distributors. TDSC contends that the witnesses' misconceptions of TDSC policy, fostered by the misrepresentations of other TDSC distributors, led the trial court to conclude that its activities fall within the ambit of the Act.

As we have previously stated, TDSC's activities constitute a pyramid sales scheme under the Act, and its new policy does not change this result. Under the Act, it is unlawful "for any person, by himself *or through others*, to sell, offer to sell, or attempt to sell the right to participate in a pyramid sales scheme." (Emphasis added.) (Ill. Rev. Stat. 1983, ch. 121½, par. 262A(2).) Under the facts at bar, TDSC's liability under the Act is inescapable. The evidence also demonstrates

an effort to continue the scheme within the State. According to the testimony of TDSC's witnesses, a TDSC field instructor training program was to be held in Quincy on April 28 and 29, but was canceled after the issuance of the TRO.

## CONSTITUTIONALITY OF SECTION 1(g)

■ The next argument raised by the defendants is that section 1(g) of the Act setting forth the definition of a pyramid sales scheme is void for vagueness. That section provides that the right to benefit received in exchange for money or other value must be "primarily" based on recruiting others to participate and must not be "primarily" contingent upon the volume of goods sold for purposes of resale to consumers. (Ill. Rev. Stat. 1983, ch. 121½, par. 261(g).) The defendants contend that the word "primarily" does not inform a person of reasonable intelligence of what conduct is prohibited by the Act. We disagree.

"Primarily" means "pre-eminently" or "fundamentally." (See *Mid-South Chemical Corp. v. Carpentier* (1958), 14 Ill. 2d 514, 153 N.E.2d 72.) This term is certainly less broad than other terms contained in the Act which have withstood void-for-vagueness challenges. In *Scott v. Association for Childbirth at Home, International* (1981), 88 Ill. 2d 279, 289, 430 N.E.2d 1012, 1017, the court held that the terms "deception," "false pretense," "misrepresentation," and "fraud" are " 'sufficiently explicit to inform those who are subject to [the Act] of the conduct on their part to which it applies' *(Stein v. Howlett* (1972), 52 Ill. 2d 570, 580, [289 N.E.2d 409, 414]), and therefore cannot be said to be unconstitutionally vague." The court further stated that "[g]reater leeway in definition is allowed the legislature in the context of regulatory statutes governing business activities." (88 Ill. 2d 279, 290, 430 N.E.2d 1012, 1018.) We hold that the term "primarily" provides fair notice to those who are subject to the Act of the schemes and ventures which are prohibited.

We also reject the defendants' contention that the statute is unconstitutional because it places an undue burden on interstate commerce. TDSC argues that the cost of requiring it to monitor the retail sales of its distributors to insure that the benefit they receive is primarily from retail sales would be prohibitive.

In *Pike v. Bruce Church, Inc.* (1970), 397 U.S. 137, 142, 25 L. Ed. 2d 174, 178, 90 S. Ct. 844, 847, the United States Supreme Court set out the test for determining whether a State statute which affects interstate commerce violates the commerce clause:

"Where the statute regulates evenhandedly to effectuate a le-

gitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. [Citation.] If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities."

Section 1(g) of the Act applies indiscriminately to all sales schemes, whether they involve business transactions within or outside of Illinois. The stated purpose of the Act is to protect consumers, borrowers, and businessmen from fraud, unfair or deceptive acts or practices, and business transactions. *Frahm v. Urkovich* (1983), 113 Ill. App. 3d 580, 447 N.E.2d 1007.

■ The inherently fraudulent nature of pyramid sales schemes was recognized and discussed in *People ex rel. Fahner v. Walsh* (1984), 122 Ill. App. 3d 481, 486-87, 461 N.E.2d 78, 82-83:

"Pyramid programs *** which induce a person to participate on the representation that he or she cannot only regain the purchase price, but also reap profits by selling the plan to others, are inherently deceptive and contrary to public policy. (*Twentieth Century Co. v. Quilling* (1907), 130 Wis. 318, 324-25, 110 N.W. 174, 176; *Kugler v. Koscot Interplanetary, Inc.* (1972), 120 N.J. Super. 216, 232, 293 A.2d 682, 690-91; *State by Lefkowitz v. ITM, Inc.* (1966), 52 Misc. 2d 39, 275 N.Y.S.2d 303; *In re Holiday Magic, Inc.* (Oct. 15, 1974), 84 F.T.C. 748.) The deception arises because the market eventually becomes saturated and the seemingly endless chain must end; consequently, many participants cannot even recoup their investments, let alone make a profit. (*State ex rel. Sanborn v. Koscot Interplanetary, Inc.* (1973), 212 Kan. 668, 675-76, 512 P.2d 416, 423; *Lefkowitz v. ITM, Inc.* (1966), 52 Misc. 2d 39, 275 N.Y.S.2d 303; *In re Holiday Magic, Inc.* (Oct. 15, 1974), 84 F.T.C. 748.)"

The eradication of such fraudulent schemes is clearly a legitimate and important State interest.

■ The defendants claim that in order to comply with the Act they would have to furnish forms to all TDSC distributors and require all distributors to provide the requested information concerning retail sales. They argue that this would be "extremely difficult, if not physically impossible."

We note that the majority of TDSC distributors place an order

each month for either products or the computer report, or both, and that TDSC, through its "Executive Management Information Service," extensively monitors the activities of its distributors. We do not consider the additional administrative burden imposed in monitoring its distributors' retail sales to be excessive or even significant when compared to the protection afforded by the Act to the residents of this State.

▆▆ ▆ The defendants contend that the Illinois statute is unique in imposing such a restriction on multilevel sales companies. The defendants argue that this fact alone constitutes a violation of the commerce clause. This argument is without merit. Other States similarly prohibit only those sales schemes which place their primary emphasis on profits made by recruiting other participants. (Mo. Ann. Stat. sec. 407.400(5) (Vernon 1979); *State v. Solem* (1974), 301 Minn. 282, 222 N.W.2d 98.) Additionally, many States blanketly prohibit all pyramid schemes wherein participants receive value, other than payment based on the sales of goods and services to nonparticipants, for inducing other persons to become participants in the program. (See, *e.g.,* Nev. Rev. Stat. sec. 598.100 (1979); N.C. Gen. Stat. sec. 14–291.2(b) (1981); Ohio Rev. Code Ann. sec. 1333.91 (Page 1979); Pa. Stat. Ann. tit. XIII, sec. 201–2(4)(xiii) (Purdon 1983).) Thus, the Illinois statute is not unique and—in fact—is less restrictive than the acts in many States.

In conclusion, the pyramid sales scheme statute does not place an undue burden on interstate commerce.

#### REQUISITE SHOWING FOR INJUNCTIVE RELIEF

▆▆ Next, we consider the defendants' argument that the TRO was wrongfully issued. Any issue regarding a TRO is moot when the TRO has expired and the record does not indicate any possibility of damages. (*Rotary Club v. Harry F. Shea & Co.* (1983), 120 Ill. App. 3d 988, 458 N.E.2d 1002; *City of Chicago v. Airline Canteen Service, Inc.* (1978), 64 Ill. App. 3d 417, 380 N.E.2d 1106.) Under the doctrines of sovereign immunity and public officials' immunity, the defendants are barred from recovering monetary damages. (Ill. Rev. Stat. 1983, ch. 127, par. 801; *People ex rel. Scott v. Briceland* (1976), 65 Ill. 2d 485, 359 N.E.2d 149.) Thus, the question of whether the trial court abused its discretion in granting the TRO is moot.

▆▆ ▆ The defendants also argue that the trial court erred in granting the preliminary injunction because the Attorney General failed to prove the common law requirements for injunctive relief. The Attorney General is specifically authorized to seek an injunction under

section 7 of the Act, which provides in pertinent part, as follows:

"Whenever the Attorney General has reason to believe that any person is using, has used, or is about to use any method, act or practice declared by Sections 2 through 20 of this Act to be unlawful, and that proceedings would be in the public interest, he or she may bring an action *** to restrain by preliminary or permanent injunction the use of such method, act or practice." Ill. Rev. Stat. 1983, ch. 121½, par. 267.

In *People ex rel. Edgar v. Miller* (1982), 110 Ill. App. 3d 264, 441 N.E.2d 1328, this court held that when an injunction is authorized by statute, the traditional common law grounds for relief need not be established and that the requirements of the statute are controlling. This position is in accord with numerous other jurisdictions, which hold that where an injunction is sought pursuant to a statute which provides a governmental agent with the means to enforce public policy, the common law requirements for relief need not be proved as long as the statutory requirements are met. See *State ex rel. Edmisten v. Challenge, Inc.* (N.C. App. 1981), 54 N.C. App. 513, 284 S.E.2d 333, and cases cited therein.

The defendants rely upon *Oscar George Electric Co. v. Metropolitan Fair & Exposition Authority* (1982), 104 Ill. App. 3d 957, 433 N.E.2d 958, as support for their position. There the statutory provision was not a regulatory scheme and merely authorized the injured party, an aggrieved bidder on a governmental contract, to "bring a suit in equity." Thus, *Oscar George Electric* is distinguishable and is not controlling here.

In conclusion, we find that the Attorney General, seeking an injunction pursuant to the Act, need only show a violation of the statute.

Accordingly, for the foregoing reasons, we affirm.

Affirmed.

GREEN and WEBBER, JJ., concur.