517 A.2d 1139

**Erik E. SCHRADER**

v.

**STATE of Maryland.**

**No. 240, Sept. Term, 1986.**

Court of Special Appeals of Maryland.

Dec. 4, 1986.

378

Bernard P. Horn (John V. Long and Long & Long, P.A. on the brief), Bethesda, for appellant.

John S. Bainbridge, Jr., Asst. Atty. Gen. (Stephen H. Sachs, Atty. Gen., Baltimore, Andrew L. Sonner, State's Atty. for Montgomery County and Constance A. Junghans, Asst. State's Atty. for Montgomery County on the brief, Rockville), for appellee.

Argued before GARRITY, BLOOM, and KARWACKI, JJ.

KARWACKI, Judge.

· Erik E. Schrader, the appellant, was convicted at a bench trial in the Circuit Court for Montgomery County (Irma S. Raker, J.) of conspiracy to establish an illegal pyramid promotional scheme in violation of Md.Code (1957, 1982 Repl.Vol., 1985 Supp.), Article 27, § 233D. He was sentenced to a one year term of imprisonment, which was suspended, five years of supervised probation, and a fine of $10.000 to be paid within 60 days.

The General Assembly enacted Article 27, § 233D by Chapter 507 of the Acts of 1984, which took effect on July 1, 1984. Section 233D(a)(4) defines a "pyramid promotional scheme" as

> any plan or operation by which a participant gives consideration for the opportunity to receive compensation to be derived primarily from any person's introduction of other persons into participation in the plan or operation rather than from the sale of goods, services, or other intangible property by the participant or other persons introduced into the plan or operation.

Subsection (b) states that "[a] person may not establish, operate, advertise, or promote a pyramid promotional scheme." Violation of that prohibition renders a person guilty of a misdemeanor punishable by fine and/or imprisonment. Article 27, § 233D(c).

Pyramiding is a type of multi-level marketing operation which theoretically serves as a method of distributing a company's products to the public. Annot., 54 A.L.R.3d 217, 219 (1973). Participants in the operation are spread out over various distribution levels through which products are resold until they reach the consumer. *Id.* However, because "one profits merely by being a link in the product distribution chain, the emphasis is on recruiting more investor-distributors rather than on retailing products." Note,

*Pyramid Schemes: Dare to be Regulated,* 61 Georgetown
L.J. 1257, 1259 (1973).

A participant's recruitment of others into the pyramid
operation results in creation of that participant's "down-
line," consisting of those persons recruited by the partici-
pant himself and by the participant's recruits. The down-
line is created by recruiting a preestablished number of
individuals into the first level of the operation, each of
whom then recruits an equal number of additional persons.
The original participant moves up to the next level of the
operation each time the bottom level of recruits in his
downline is completed, with the process ideally continuing
until the original participant's downline reaches a maximum
figure determined by the number of levels in the pyramid.
A participant may earn commissions from the sale of prod-
ucts to the distributors within his downline, but commis-
sions are also received from entry fees paid by new recruits
into one's downline.

The type of pyramid operation with which § 233D is
concerned is one in which a participant's compensation is
"derived primarily" from the participant's recruitment of
others into the operation rather than from the sale of goods
or services. With that consideration in mind, we now
review the evidence in this case.

On February 4, 1985, the Montgomery County Police
Department received a complaint concerning C.I. Systems
("CIS"), which was owned and operated by the appellant.
Initiating an investigation into the company, Montgomery
County Vice and Intelligence Officer John Sheridan called a
telephone number obtained from a CIS flyer and heard a
recorded message to the effect that "C.I. Systems would act
as a consultant for a person that became involved. One
could earn $300 to $700 a month in approximately three
months. This amount could double every six to nine
months." The recording further advised that "[n]o selling
was involved, and four to six hours per week is all that it
would be necessary to work." Two additional telephone

numbers, one in Virginia and the other in Maryland, were then provided. Officer Sheridan called the Maryland number and heard another recording, this one giving directions to CIS meetings at an office located in Bethesda, Maryland and requesting that callers leave their names and the date of the meeting they would attend. Officer Sheridan gave an undercover name and stated that he would attend the meeting on February 6, 1985.

On February 6, Officer Sheridan attended a meeting at the address indicated in the second recorded message. Conducting the meeting was one Robert Schaffer, who identified himself as a member of CIS's board of directors.[1] Mr. Schaffer informed those gathered at the meeting that an initial payment of $45 could result in earnings of $300 to $700 a month within 3–6 months and of $2,000 a month within 6–12 months, without any selling required. He also advised that Erik Schrader was the founder and head of CIS.

Eight days later, on February 14, 1985, Officer Sheridan attended a second meeting at the same location. The meeting was again conducted by Robert Schaffer, who this time explained the various recruiting methods used by CIS. Among the methods discussed were flyers, tear-off slips, advertisements in newspapers and magazines, and the wearing of buttons to prompt inquiries from others. Mr. Schaffer stated that a $65 fee was required to join CIS, at which time flyers could be purchased at a special initial rate of $25 per 1,000. He then explained in further detail the overall nature of the operation, which involved the recruitment of others into the enterprise at different "levels."[2] According to Officer Sheridan's testimony at the appellant's

---

1. Mr. Schaffer was named as an unindicted co-conspirator in the charging document ultimately filed against the appellant.

2. These "levels" were the companies or programs which made up the components of the CIS operation. The programs were identified as: the Flyer Program, Morn'n Sun, Success Synergistics, the Silver Letter Program, Yurika Foods, and the VIP Program.

trial, recruitment was emphasized as the focus of the operation; selling and the product line were incidental. To the extent products were involved, participants in the programs were generally buyers rather than sellers.[3]

On March 23, 1985, Officer Sheridan attended a third meeting, this one at the CIS home office in Springfield, Virginia. The appellant was introduced at this meeting as the president of CIS. He spoke about a new plan he was introducing that would allow someone, for a payment of $475, to go directly into the VIP Program without progressing through the other programs. Again, the explanation of the program indicated that recruitment of others was the primary means by which participants could earn money.

Based on Officer Sheridan's investigation, search warrants were obtained for the CIS offices in Maryland and Virginia.[4] The ensuing searches resulted in the seizure of various records and documents from those offices.

William L. Holmes, a special agent with the Federal Bureau of Investigation, testified for the State at the appellant's trial as "an expert on the examination and interpretation of records for pyramid schemes." Based on his review of the materials seized from the CIS offices, Agent Holmes gave extensive testimony over two days, outlining the way in which CIS and its connected programs worked. He concluded that the various programs promoted by CIS—the Flyer Program, Morn'n Sun, Success Synergistics, the Silver Letter Program, Yurika Foods, and the VIP Program— were interrelated parts of the same system.

At the trial judge's request, Agent Holmes presented an overview of the CIS operation. Agent Holmes testified that an individual had to join the Flyer Program in order to

---

3. Depending on the program, participants were entitled to purchase or, in certain programs, required to purchase such items as cosmetics, silver bars, food products, and diamonds.

4. The Virginia search warrant was applied for and executed by the police department of Fairfax County, Virginia.

qualify for Morn'n Sun. Once qualified for Morn'n Sun, the participant was to recruit other individuals to participate in that program. In Phase One of Morn'n Sun, a participant recruited three individuals, each of whom then recruited three additional persons, for a total of nine. In the third level of Phase One, those nine individuals each recruited three more persons, who became part of the original participant's downline. This completed Phase One for the original participant, who then advanced to Phase Two of Morn'n Sun, which involved similar multi-level recruitment. The participant would continue to build his downline by bringing people into successive levels of Phase Two, followed by the same process in Phase Three. The participant received commissions based upon his recruitment of others into certain levels, but Agent Holmes explained that it was necessary to bring over seven million people into the organization in order to gain full commission benefits. With respect to payment of commissions, the trial judge had the following exchange with Agent Holmes:

THE COURT: So, in your view, the only thing a participant has to do to get money or commissions is to keep bringing people in.

THE WITNESS: That's correct.

THE COURT: He gets more people, he gets more people, and he gets more.

THE WITNESS: That's correct.

Agent Holmes further testified that a participant was required to join Success Synergistics and the Silver Letter Program within six months after entry into the Flyer Program. In return for an initial payment, Success Synergistics and Silver Letter distributed training aids, such as a newsletter and an instructional cassette, which enabled an individual to continue operating in Morn'n Sun. The next stage of the CIS operation was Yurika Foods, which, according to Agent Holmes, was distinguishable from the other CIS programs in that advancement was based on the volume of food sales rather than on the number of individuals recruited. The final CIS program was the VIP Pro-

gram, which was another recruitment operation similar to Morn'n Sun except that VIP involved five phases rather than three and a greater investment by participants.

Agent Holmes, when asked whether his review of the records seized from the CIS offices revealed any evidence that the programs involved the sale of products to anyone other than participants in the program, responded, "No, ma'am, I did not." On the ultimate issue of whether the CIS operation constituted a pyramid promotional scheme, the following colloquy took place:

> [PROSECUTOR]: Agent Holmes, if a pyramid promotional scheme is defined as an operation to which a participant gives consideration or money for the opportunity to receive money or compensation which is derived primarily from introducing other people into the same program, rather than from the sale of goods—based on that definition, what would your opinion of CI Systems be?

> [AGENT HOLMES]: That all of the designated programs would fit within that category except Yurika Foods.

Moreover, Agent Holmes testified that, in his opinion, even if the various programs were separately owned and operated, CIS would still be a pyramid operation because it was "using those companies to facilitate the down liner system or programs."

In addition to Agent Holmes and Officer Sheridan, the State called one other witness, Richard Retta, who testified about his personal experience as a member of CIS. According to Mr. Retta, the only time a participant received products was when he first joined and paid the initial fee of $45.[5] Mr. Retta received commissions for getting new recruits to join the company. He was not required to sell

---

5. In Mr. Retta's case, he received two seven or eight ounce vials of shampoo. He received no additional products except a magazine subscription when he later joined Success Synergistics. Even that magazine was not really a product so much as a training manual for persons who joined Success Synergistics.

any products. For a fee of $50, CIS kept track of Mr. Retta's "down line" of recruits.

After the State rested its case, the appellant moved for judgment of acquittal. In conjunction with that motion, he filed what he titled a "Motion to Declare Maryland Code, Article 27 Sections [sic] 233(D) Unconstitutionally Vague as Applied to this Defendant." The trial court treated the latter motion as a motion to dismiss and denied it. After the motion for judgment of acquittal was also denied, the appellant chose to rest his case without offering any evidence. Following closing arguments, the trial court found the appellant guilty of conspiring with Robert Schaffer to establish an illegal pyramid promotional scheme.

The appellant's contentions on appeal can be reduced to the following:

I. The trial court erred in denying the appellant's motion seeking to have Article 27, § 233D declared unconstitutionally vague as applied to him.

II. The trial court erred in according the testimony of the State's expert witness any evidentiary value because that testimony was based on documents which were not admitted into evidence for their truth.

III. The evidence was insufficient to support the appellant's conviction.

## I.

At the conclusion of the State's case, the appellant moved for judgment of acquittal and also filed a "Motion to Declare Maryland Code Article 27 Sections [sic] 233(D) Unconstitutionally Vague as Applied to this Defendant." The latter motion was supported by a memorandum of authorities. The trial judge treated the latter motion as one to dismiss the prosecution and excused its untimeliness under Rule 4–252 over the objection of the prosecutor. After considering the written and oral arguments of counsel, the motion was denied. Under these circumstances, we believe the issue has been preserved for our review. *Cf.*

*Vuitch v. State,* 10 Md.App. 389, 393–401, 271 A.2d 371 (1970), *cert. denied,* 261 Md. 729, *cert. denied,* 404 U.S. 868, 92 S.Ct. 44, 30 L.Ed.2d 112 (1971), where this Court declined to consider a constitutional attack upon a penal statute where there had been no pretrial motion to dismiss filed pursuant to former Rule 725 b. There the issue was raised for the first time in a motion for judgment of acquittal at the conclusion of the State's case, and the record failed to indicate that the trial judge had considered the constitutional issue in denying the defendant's motion for judgment of acquittal.

The appellant correctly asserts that legislative acts creating crimes must be clear and certain.[6] As stated by the Supreme Court, such laws must "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 2298–99, 33 L.Ed.2d 222, 227 (1972). Furthermore, "where a statute imposes criminal penalties, the standard of certainty is higher" than the standard applicable to statutes imposing only civil penalties. *Kolender v. Lawson,* 461 U.S. 352, 359 n. 8, 103 S.Ct. 1855, 1859, n. 8, 75 L.Ed.2d 903, 910 (1983).

A comprehensive discussion of the void-for-vagueness doctrine is found in *Bowers v. State,* 283 Md. 115, 389 A.2d 341 (1978). The Court of Appeals there stated:

The cardinal requirement is that a penal statute "be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties." *Connally v. General Const. Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926). "[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its

---

**6.** The requirement of precision in penal statutes is an element of the constitutional guarantee of due process of law found in the Fourteenth Amendment of the United States Constitution and in Article 24 of the Maryland Declaration of Rights.

application, violates the first essential of due process of law." *Id.* The Fifth and Fourteenth Amendments guarantee that "[n]o one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes. All are entitled to be informed as to what the State commands or forbids." *Lanzetta v. New Jersey,* 306 U.S. 451, 453, 59 S.Ct. 618 [619], 83 L.Ed. 888 (1939). *Accord, Hynes v. Mayor of Oradell,* 425 U.S. 610, 620, 96 S.Ct. 1755 [1760], 48 L.Ed.2d 243 (1976); *United States v. Mazurie,* 419 U.S. 544, 553, 95 S.Ct. 710 [715], 42 L.Ed.2d 706 (1975); *Smith v. Goguen,* 415 U.S. 566, 572 n. 8, 94 S.Ct. 1242 [1247 n. 8], 39 L.Ed.2d 605 (1974); *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294 [2298], 33 L.Ed.2d 222 (1972); *Bouie v. City of Columbia,* 378 U.S. 347, 350–51, 84 S.Ct. 1697 [1700–01], 12 L.Ed.2d 894 (1964); *United States v. Harriss,* 347 U.S. 612, 617, 74 S.Ct. 808 [811], 98 L.Ed. 989 (1954); *Winters v. New York,* 333 U.S. 507, 515–16 [670–71], 68 S.Ct. 665, 92 L.Ed. 840 (1948). *See generally* Note, *The Void-For-Vagueness Doctrine in the Supreme Court,* 109 U.Pa.L.Rev. 67 (1960).

In assessing the constitutionality of a statute assailed as overly uncertain either in respect of the acts it purports to prohibit or the persons to whom it applies, courts typically consider two basic criteria. The first of these may be described as the fair notice principle and is grounded on the assumption that one should be free to choose between lawful and unlawful conduct. Due process commands that persons of ordinary intelligence and experience be afforded a reasonable opportunity to know what is prohibited, so that they may govern their behavior accordingly.

· · · · ·

A statute may also be stricken for vagueness if it fails to provide legally fixed standards and adequate guidelines for police, judicial officers, triers of fact and others whose obligation it is to enforce, apply and administer the penal laws.

> "A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Grayned v. City of Rockford,* 408 U.S. at 108–109 [92 S.Ct. at 2299]; *accord, Papachristou v. City of Jacksonville,* 405 U.S. 156, 170, 92 S.Ct. 839 [847], 31 L.Ed.2d 110 (1972).

This is not to say, of course, that a criminal statute is void merely because it allows for the exercise of some discretion on the part of law enforcement and judicial officials. It is only where a statute is so broad as to be susceptible to irrational and selective patterns of enforcement that it will be held unconstitutional under this second arm of the vagueness principle. *See Giaccio v. Pennsylvania,* 382 U.S. 399, 402–403, 86 S.Ct. 518 [520–521], 15 L.Ed.2d 447 (1966).

As a general rule, the constitutionality of a statutory provision under attack on void-for-vagueness grounds must be determined strictly on the basis of the statute's application to the particular facts at hand. *United States v. Powell,* 423 U.S. 87, 92, 96 S.Ct. 316 [319], 46 L.Ed.2d 228 (1975); *United States v. Mazurie,* 419 U.S. at 550 [95 S.Ct. at 714]; *United States v. National Dairy Corp.,* 372 U.S. 29, 32–33, 83 S.Ct. 594 [597–598], 9 L.Ed.2d 561 (1963). Thus, it will usually be immaterial that the statute is of questionable applicability in foreseeable marginal situations, if a contested provision clearly applies to the conduct of the defendant in a specific case. *United States v. Petrillo,* 332 U.S. 1, 7, 67 S.Ct. 1538 [1541], 91 L.Ed. 1877 (1947).

*Id.* at 120–22, 389 A.2d 341.

The appellant's contention that Article 27, § 233D is unconstitutionally vague as applied to him centers around the definition of "pyramid promotional scheme" in subsection (a)(4). The major thrust of the appellant's vagueness argument seems to be that § 233D(a)(4) is impermissibly vague because "it fails to provide legally fixed standards

and adequate guidelines for police, judicial officers, triers of fact and others whose obligation it is to enforce, apply and administer" the statute. *Bowers v. State, supra,* 283 Md. at 121, 389 A.2d 341. Nevertheless, because the appellant also expresses concern about the clarity with which the statute defines "pyramid promotional scheme," we first examine whether it affords "fair notice" of what type of operation is prohibited.

### A. *Fair Notice*

■ As defined in § 233D(a)(4), a pyramid promotional scheme is an operation in which a participant's compensation is "to be derived primarily from" recruitment of other participants into the operation rather than from the sale of goods or services. The word at issue in the statute is "primarily." The Court of Appeals in *Bowers* explained that "[a] statute is not vague when the meaning of the words in controversy can be fairly ascertained by reference to judicial determinations, the common law, dictionaries, treatises or even the words themselves, if they possess a common and generally accepted meaning." *Id.* at 125, 389 A.2d 341. We believe the word "primarily," as used in § 233D(a)(4), possesses a common and generally accepted meaning. Webster's New World Dictionary (2d College ed. 1982) defines "primarily" as "mainly; principally." In quantifiable terms, "primarily" is commonly understood to suggest a figure representing more than 50 percent. Thus, the definition of "pyramid promotional scheme" in § 233D(a)(4) imposes a standard requiring that participants in a pyramid operation derive more than 50 percent of their compensation from recruitment for the operation to fall within the definition. We find nothing ambiguous about the term "primarily" as used in that definition.

An Illinois anti-pyramid statute using the word "primarily" survived a similar attack based on vagueness grounds. The Illinois statute defined a "pyramid sales scheme" to include

any plan or operation whereby a person in exchange for money or other thing of value acquires the opportunity to

receive a benefit or thing of value, which is *primarily* based upon the inducement of additional persons, by himself or others, regardless of number, to participate in the same plan or operation and is not *primarily* contingent on the volume or quantity of goods, services, or other property sold or distributed or to be sold or distributed to persons for purposes of resale to consumers.

Ill.Rev.Stat. (1983), Ch. 121½, Par. 261(g) (emphasis added). In *People ex rel. Hartigan v. Dynasty System Corp.*, 128 Ill.App.3d 874, 83 Ill.Dec. 937, 471 N.E.2d 236 (1984), that statute was challenged as void for vagueness on grounds that "the word 'primarily' does not inform a person of reasonable intelligence of what conduct is prohibited by the Act." *Id.* 83 Ill.Dec. at 942, 471 N.E.2d at 241. Rejecting that argument, the Illinois court reasoned that " '[p]rimarily' means 'pre-eminently' or 'fundamentally' " and that the term "is certainly less broad than other terms contained in the Act which have withstood void for vagueness challenges." *Id.* The Court held that "the term 'primarily' provides fair notice to those who are subject to the act of the schemes and ventures which are prohibited." *Id.* 83 Ill.Dec. at 943, 471 N.E.2d at 242.

In 1983, the Utah legislature, apparently in an effort to cure potential vagueness problems in that state's 1973 anti-pyramid law, *added* the word "primarily" to the definition of a pyramid scheme. Utah Code (1953, 1983 Supp.), § 76–6a–2(4).

... [T]he Act attempts to cure potential problems of constitutional vagueness by defining a pyramid scheme as "any sales device or plan" in which a person provides consideration "for compensation or the right to receive compensation which is derived *primarily* from the introduction of other persons into the sales device or plan rather than from the sale of goods, services or other property." Thus, even if a multilevel plan involves a product that profitably may be sold to the consumer, it is still an illegal pyramid if the promised profits are derived

primarily from recruitment. That definition does not appear to be unconstitutionally vague because it distinguishes more clearly than the 1973 law between genuine multilevel marketing plans and pyramid schemes by requiring that compensation be derived *primarily* from introduction of others into the scheme, rather than including organizations that pay *any* compensation derived from introduction of others into the scheme.

*Utah Legislative Survey*, 1984 Utah L.Rev. 115, 215–16 (footnotes omitted) (emphasis in original).

■ The word "primarily," as used in the definition of "pyramid promotional scheme" in § 233D(a)(4), has a sufficiently definite meaning to afford a person of ordinary intelligence and experience a reasonable opportunity to know what is prohibited by the statute. We therefore hold that § 233D provides adequate notice of the type of pyramid operations which are prohibited.

### B. *Adequate Guidelines*

■ The appellant also argues that the statute fails to set forth any objective standards for police, judicial officers, triers of fact and others who must enforce it. Rather, he asserts, the statute requires the use of subjective standards for the purpose of ascertaining whether the compensation of participants in an allegedly illegal pyramid promotional scheme is derived primarily from recruitment rather than from sales of goods or services. We disagree.

The question of the source of the primary compensation of participants in a multi-level marketing operation is a matter of sufficiency of the evidence offered to prove guilt under § 233D. "Primarily" is an adequate benchmark for enforcement of the statute and evaluation of prosecutions brought for its violations.

### II.

The appellant posits that the testimony of Agent Holmes, who was the State's first witness, totally lacked evidentiary value because he premised his expert opinions upon the

documents seized from the CIS offices in Maryland and Virginia. Because, in the appellant's view, these documents were not admitted into evidence for their truth, Agent Holmes' testimony based upon them should not have been accorded any evidentiary weight. The appellant cites in particular the expert's reliance on "the hypothetical truth of a plan contained on a document called the 'downliner.'" According to the appellant, neither of the State's other witnesses (Officer Sheridan and Mr. Retta) who testified from personal knowledge authenticated this document, nor did they describe the CIS operation in a manner consistent with the operation outlined in the document.

■ The short answer to the appellant's argument is that the documents at issue were admitted into evidence without limitation. The appellant contends that the documents were admitted into evidence subject to a stipulation that they were not to be considered for the truth of what they contained, but only for the purpose of showing they were found at the CIS offices. The record belies his contention:

THE COURT: Have they been received in evidence? Is there a stipulation that all these documents—

MS. JUNGHANS [PROSECUTOR]: Yes, that they all—

THE COURT: (continuing)—are admissible into evidence?

MS. JUNGHANS: (continuing)—the contents of the boxes; that is what the stipulation was, yes.

MR. HORN [DEFENSE]: Yes, we stipulated that the—

THE COURT: All exhibits A through E will be received in evidence?

MR. HORN: For the purpose of showing that they were located at those offices.

THE COURT: Well, is there any objection on relevancy grounds?

MR. HORN: No.

THE COURT: Let me understand the stipulation. The stipulation is that they were all seized from the two offices and that they are admissible into evidence.

MR. HORN: For the limited purpose of saying that they were there. That is all we are—

THE COURT: You do not object to them being received in evidence?

MR. HORN: No, Your Honor.

THE COURT: They will be received.

Based on that exchange, we could easily conclude that no objection to the evidence was registered and that its admissibility is thus not before this Court. Rule 1085; *Standifur v. State*, 64 Md.App. 570, 578, 497 A.2d 1164 (1985), *cert. granted*, 305 Md. 175, 501 A.2d 1323 (1986).

■ Moreover, we note that the appellant's argument actually concerns the weight to be accorded the expert testimony of Agent Holmes. The appellant did not challenge the credentials of Agent Holmes as an expert, nor did he object to Agent Holmes' expression of the opinion that CIS constituted a pyramid promotional scheme. The admissibility of expert testimony is a matter largely within the discretion of the trial court. *Johnson v. State*, 303 Md. 487, 515, 495 A.2d 1 (1985); *Waltermeyer v. State*, 60 Md.App. 69, 79, 480 A.2d 831, *cert. denied*, 302 Md. 8, 485 A.2d 249 (1984). The weight to be accorded it is left to the trier of fact. *Fitzwater v. State*, 57 Md.App. 274, 281–82, 469 A.2d 909 (1984). We perceive no error in allowing Agent Holmes, once qualified as an expert in interpreting records of pyramid operations, to testify as to his opinion regarding the CIS operation. *Cf. Spriggs v. State*, 226 Md. 50, 52, 171 A.2d 715 (1961).

### III.

■ Finally, we review the sufficiency of the evidence to support the appellant's conviction. The standard for reviewing sufficiency of the evidence in criminal cases is "whether after viewing the evidence in the light most favorable to the prosecution *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Bloodsworth v. State*, 307 Md. 164, 167, 512 A.2d 1056 (1986).

Criminal conspiracy requires a combination of two or more persons, who by some concerted action seek to

accomplish some criminal act or unlawful purpose;  or to accomplish some purpose, not in itself criminal or unlawful, by criminal or unlawful means.

*Rhoades v. State,* 56 Md.App. 601, 612, 468 A.2d 650 (1983), *cert. granted,* 299 Md. 492, 474 A.2d 917, *cert. dismissed,* 300 Md. 792, 481 A.2d 238 (1984).  No formal agreement need be shown to make out a conspiracy;  the State must present only so much evidence as would "allow the fact finder to infer that the parties tacitly agreed to commit an unlawful act."  *Id.*  We believe the testimony of Officer Sheridan served as sufficient evidence that the appellant and Robert Schaffer worked together in furtherance of the objectives of CIS.  The only question remaining is whether the evidence established that those objectives were in violation of the anti-pyramid law.

■ We believe the evidence was sufficient.  The boxes of documentary evidence seized from the CIS offices in Maryland and Virginia demonstrate that the business was essentially nothing more than a recruitment scheme.  The testimony of both Officer Sheridan and Mr. Retta indicated that participants were told they did not have to concern themselves with selling anything;  rather, they could earn money by recruiting others into the operation.  In the opinion of the State's expert witness, the appellant's operation was one primarily for recruiting people into the pyramid and not for selling products.  According to the expert, the individual programs promoted by CIS, even if separate business entities, were used by CIS "to facilitate the down liner system or programs."  We conclude that there was ample evidence to support the finding of the trial judge that the appellant was guilty of conspiring to violate Article 27, § 233D.

JUDGMENT AFFIRMED;  COSTS TO BE PAID BY THE APPELLANT.