Robert Dean PHILPOT, Appellant,

v.

The STATE of Texas, Appellee.

No. C14–87–00273–CR.

Court of Appeals of Texas,
Houston (14th Dist.).

Oct. 27, 1988.

---

Candelario Elizondo, Michael B. Charlton, Charles F. Baird, Houston, for appellant.

William J. Delmore, III, Houston, for appellee.

Before JUNELL, SEARS and CANNON, JJ.

## OPINION

JUNELL, Justice.

Appellant entered a plea of not guilty before the court to the offense of operating and participating in an endless chain scheme. TEX.PENAL CODE ANN. § 32.48. He was convicted and the court assessed punishment at confinement for six months and a fine of $1,000. We affirm.

In a single point of error appellant challenges the sufficiency of the evidence to sustain the conviction. More specifically, appellant contends that the operation with which he was admittedly involved does not meet the statutory definition for an endless chain scheme.

Viewed in the light most favorable to the verdict, the evidence shows that in May 1986, Constance Dubroff attended a meeting at which appellant sought participants in a "multilevel marketing company" called Philco Money Express ("the Express"). Dubroff paid $1,000 to participate in the scheme and travelled to other areas to promote the Express.

On July 17, 1986, Harris County Assistant District Attorney Jean Spradlin and two investigators employed by the district attorney's office attended a meeting at which the Express was discussed. At that meeting appellant explained to those who attended that the Express was a "multilevel marketing program in which you could make money by bringing in other people." The scheme consisted of a "five by seven matrix" where, at each of seven levels, a participant recruited five other new participants who in turn recruited five more for the level below them. A person could become a "subscriber" at level one by paying $1,000 to appellant. By selling one subscription for $1,000 to another person a subscriber could become a "supervisor." A supervisor would receive a $400 "instant cash bonus" for each person he or she brought into the Express. To maintain supervisor status one had to bring in at least one additional participant per month. A supervisor could also sell five "subscriptions" within a specified period after becoming a supervisor and thereby become a "charter supervisor." A charter supervisor was not required to maintain a minimum level of activity in order to continue receiving bonus payments.

Another twist to the scheme was that one could theoretically become involved without paying appellant the initial $1,000. To do this, such a "representative with no money down" could sell subscriptions to others, receiving $100 for each subscription he sold. By selling five subscriptions within a specified time period he could become a supervisor. After becoming a supervisor he was entitled to receive a full $400 for each additional subscription sold. Constance Dubroff testified that she had recruited more than a hundred other participants and that, to her knowledge, no one other than appellant had ever gotten into the scheme without paying appellant the initial $1,000.

Important to appellant's point of error is his contention that the purpose of the Express was to sell subscriptions to a finan-

cial magazine he published. Constance Dubroff testified that when she became involved with the Express in May 1986, she was led to believe the magazine would be published within thirty days. At the time of the meeting of July 17, 1986, when appellant was arrested, the magazine was not yet available and at that time appellant said it would not be published until October 1, 1986. In October or November 1986, after appellant had been arrested, Dubroff received a copy of a "magazine" from appellant. She had been led to believe the magazine would feature advice from "financial leaders." Dubroff testified that the magazine was not what she had been led to expect and that she would not pay anything for it, much less $1,000 for four issues.

During his presentation appellant used a pyramidal chart showing that at the third level 125 participants would be required. By the seventh level, the scheme would require 78,125 participants. A person who came in at the seventh level, like all the other participants, would be at the top of his own "five by seven matrix." However, for that matrix to ever be completed, it would require the involvement of more than ten billion participants. Those brought in at the seventh level could never hope to see their matrix completed since the population of the world would be exhausted before that could ever be accomplished.

Appellant testified at the punishment stage of trial that he had realized in excess of $300,000 from the operation of the Express. He testified further, however, that he was financially unable to make restitution. Moreover, he freely admitted he was involved in developing additional pyramidal schemes at the time of trial.

■ Appellant attacks the sufficiency of the evidence to prove the Express was an "endless chain scheme." The statute defines the term as follows:

"Endless chain" means any scheme for the disposal or distribution of property whereby a participant pays a valuable consideration for the chance to receive compensation for introducing one or more additional persons into participation in the scheme or for the chance to receive compensation when a person introduced by the participant introduces a new participant.

TEX.PENAL CODE ANN. § 32.48.

Appellant contends the Philco Money Express was not an endless chain scheme for two reasons: (1) valuable consideration was not required of all participants in order to become part of the scheme; and (2) the consideration paid by participants was for a product, a financial publication. As appellant argues,

No participant paid a fee merely for the privilege of recruiting members. One could only advance within the Money Express if additional subscriptions were sold.

Thus, according to appellant, what was involved here was not payment of a fee to participate in an endless chain scheme, but sales of subscriptions to a financial publication.

In evaluating challenges to the sufficiency of the evidence the court will review the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Jackson v. State*, 672 S.W.2d 801, 803 (Tex. Crim.App.1984). It is not our place to serve as a "thirteenth juror" to second guess the determination made by the trier of fact. Instead, the appellate court serves the function of a final due process safeguard ensuring only the rationality of the fact finder. *Moreno v. State*, 755 S.W.2d 866, 867 (Tex.Crim.App.1988).

With regard to the first question raised by appellant, it is not necessary for us to determine whether, as claimed by appellant, entry into the Express was available by means other than buying in, thus rendering the Express something other than an illegal endless chain scheme. There was evidence, albeit circumstantial, that payment of the $1,000 fee was the normal method of becoming a participant in the scheme. Constance Dubroff testified she

recruited more than 100 participants for the Express and never knew of a single person other than appellant who became a participant without paying the $1,000. The standard of review for a case proved by circumstantial evidence is the same as for a direct evidence case. *Taylor v. State,* 684 S.W.2d 682, 684 (Tex.Crim.App.1984). We hold that a rational trier of fact, on the basis of the evidence before it, could have found the essential elements of the offense by proof beyond a reasonable doubt.

■ We note, moreover, that § 32.48 by its terms, does not require that *all* participants pay "a valuable consideration for the chance to receive compensation for introducing one or more additional persons into participation in the scheme...." Even if one person gained access to the scheme by some method other than direct payment of consideration, proof that hundreds of others paid to participate would clearly be proof of an illegal endless chain scheme.

■ Appellant also argues that the Express was not illegal because participants paid, not for the privilege of receiving compensation when others were brought into the scheme, but for the purchase of a financial publication. After reviewing the evidence, we are convinced a rational trier of fact could have found by evidence beyond a reasonable doubt that the magazine "subscriptions" were nothing more than a sham designed to remove the Express from the definition of an endless chain scheme. We are reminded in this regard of what the United States Supreme Court held in another context when it said, "A quotation from Voltaire in the flyleaf of a book will not constitutionally redeem an otherwise obscene publication...." *Kois v. Wisconsin,* 408 U.S. 229, 231, 92 S.Ct. 2245, 2246, 33 L.Ed.2d 312 (1972). By the same token, a scheme which is otherwise illegal will not be removed from the definition of an endless chain scheme merely because the promoter testifies it exists for the sale of a product or service where the evidence is sufficient to show that what participants are actually paying for is the privilege to receive compensation when others are brought into the scheme. There

was sufficient evidence here for a rational trier of fact to find beyond a reasonable doubt that the financial publication appellant sold by his scheme was nothing more than a cover for an illegal endless chain scheme.

After reviewing the evidence in the light most favorable to the verdict, we conclude that the trial court, as trier of fact, could have found all the essential elements of the offense beyond a reasonable doubt. Appellant's sole point of error is overruled.

Accordingly, the judgment of the trial court is affirmed.