THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
EDWARD P. KNOP, Defendant-Appellant.

Second District   No. 2—91—1202

Opinion filed August 20, 1993.

Josette Skelnik, of Law Offices of Josette Skelnik, of Elgin, for appellant.

Val Gunnarsson, State's Attorney, of Mount Carroll, and Patrick O'Shea, of Lombard (William L. Browers, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE QUETSCH delivered the opinion of the court:

After a bench trial, defendant, Edward Knop, was convicted of promoting a pyramid sales scheme (Ill. Rev. Stat. 1987, ch. 38, par. 17—7 (now 720 ILCS 5/17—7 (West 1992))) and was sentenced to two years' probation. On appeal, defendant argues that the evidence did not prove him guilty beyond a reasonable doubt. We affirm.

In 1987, defendant founded and promoted BEK Marketing, Incorporated (BEK). On August 28, 1987, the State filed a complaint alleging that defendant knowingly offered to sell the right to participate in BEK, allegedly an unlawful pyramid sales scheme. Initially, the circuit court of Carroll County dismissed the charges on the ground that defendant acted in reliance on a judgment of the circuit court of Cook County holding that Unimax, Incorporated, on which defendant patterned BEK, was not an unlawful pyramid sales scheme. This court reversed the dismissal (*People v. Knop* (1991), 199 Ill. App. 3d 944), holding that the circuit court order was not an official interpretation of the pyramid sales statute and thus that defendant's reliance on the order was not an affirmative defense to the charge (see Ill. Rev. Stat. 1991, ch. 38, par. 4—8(b)(4) (now 720 ILCS 5/4—8(b)(4) (West 1992))). The circuit court reinstated the charge and the case went to trial.

The State's first witness was Dave Reed of the Illinois State Police. On August 19, 1987, Reed was relaxing off duty at Thulen's Pub in Savanna. Several people, including defendant, were discussing forming a club to buy products and services. As attendance was light, they decided to reconvene on August 25.

At about 8 p.m. on August 25, Reed returned to the tavern. Present in a group were defendant, Beverly Knop (then defendant's wife), and several other people. Reed listened as defendant lectured the group. Defendant stated that a person could join the buyers club for an initial fee of $50, representing $14 annual dues and $36 for the first month's dues. Upon joining the club, each buyer would sell at least three new memberships for the same $50 fee. The proceeds would go to BEK. After selling three or more memberships, the buyer would be placed into the "matrix," becoming eligible to receive

monthly royalties at some future date. In turn, each of the original buyer's recruits would sell at least three new memberships, repeating the original process. Reed's understanding of the plan was that this process would repeat itself with "[e]ach of those three to sell three and so on to infinity, I guess."

After he heard this much of the discussion, Reed sat down at the meeting. He expressed interest in joining and asked defendant if the plan was legal. Defendant said the plan was perfectly legal; it had been checked out in several States. Reed asked who would take care of financial matters, including his dues; defendant said that Beverly Knop handled all the books.

Reed requested information about the club. Defendant handed him a brochure. At trial, Reed identified State's exhibit No. 2 as an accurate copy of this brochure. The brochure describes BEK Marketing as a subsidiary of BEK Enterprises, Incorporated. A page headed "Golden Opportunities, 'Sweeping the Nation' " states that "Pre-Paid Legal Services assets exceed $44,789,000, Now that's the kind of company you like to do business with." A map shows in which States Prepaid Legal Services does business. Nothing in the brochure elaborates the relationship, if any, between Prepaid Legal Services and BEK.

The next section of the brochure is entitled "The American Dream Test." This section informs a prospective member that joining BEK can save money and that the program "could give you $25.—$50—$100. dollars [sic] or more for your $1 dollar [sic]." The "American Dream Test" asks "Do you think you could interest 3 or 4 friends or others to join the program? It is not a must that they join. It will help you if they do." If the answer to the previous question is yes, "then I'll show you the program." After a member signed the program agreement, "I'll go one step further—would you let the company give you a $20 dollar [sic] bonus every time you interest a person and they [sic] sign the program agreement?" The reader learns that if he has answered all the questions "yes," he has passed the American Dream Test and is on the way to improve his life financially and to obtain "a chance to become financially independent."

On the page after the "American Dream Test" is a schedule of seminars starting June 15, 1987, to "promote subscribors [sic]/ marketers/coordinators." The seminars would be directed by BEK, officers of two Iowa businesses, and two "coordinators" from Prepaid Legal Services.

The next five pages of the brochure inform prospective members of the opportunity to save money from various wholesalers and manu-

facturers and to obtain tax-sheltered life insurance through a Freeport, Illinois, firm. Under the heading "CLINTON, CAMANCHE" are reprints of advertisements from various businesses, including the Penthouse Restaurant, Dick's Auto Sales, Wall Street Antiques, and Heritage Motors. Underneath each advertisement is the signature of a "New Subscriber." The Savanna Moose Lodge is also listed as a "New Subscriber," with its secretary providing the "New Subscriber's Signature."

Next in the brochure is a page informing prospective members that they can "save significant money" by buying from manufacturers and wholesalers through BEK. After explaining how the buyers club works, this page states:

> "Our design is that our members, is [sic] realizing what a tremendous bargain their membership is, will want to tell others about BEK. Word of MOUTH is the best form of advertising. In recognition of this, BEK has designed a unique marketing plan that enables you to share in the success of BEK as you tell others about it. It's easy as 1-2-3. Introduce three people to BEK and you're on your way. This is what we call the MATRIX MARKETING PLAN. Your monthly bonus checks can eventually pay your membership fee and earn income."

After reprinting merchandise advertisements from various sources, informing people that membership in Prepaid Legal Services could save them money (as it did for defendant), and advertising BEK's purported new group medical insurance plan, the brochure moves to a one-page description of the "Multi-Level Marketing Plan 3 x 9 Matrix." This page promises prospective BEK "Marketers"—those who sell subscriptions to the buyers club—of the bonuses that they can achieve by recruiting new members, who in turn would recruit new members, and so on further "downline." There are nine levels or "generations" and a marketer's bonuses increase with each level he reaches. The bonuses are summarized in a table entitled "GOAL TO EARN MORE and BUILD IT BIGGER *Fabulous Bonuses*." The bonus schedule pays "6% on all 9 levels."

Immediately above the table are the following lines:

> "*MULTI-LEVEL MARKETING PLAN* 3 x 9 MATRIX
> *Each marketer must sign in at least three people to qualify for the commissions.
> *More than three AUTOMATICALLY goes in your downline.
> *Monthly bonuses paid on 9 levels.
> *All bonuses paid from subscribers' $36.00 monthly fee."

The bonus table summarizes the following information for each level (or "generation") that a marketer reaches: the number of people brought into the program; the percentage "paid downline"; the "$ per level"; and the resultant monthly totals.

We note a few examples of how the bonus system purportedly works (or was supposed to have worked). On the first level, a marketer earns $1.08 total monthly (1% each of three $36 memberships). Upon completing the requirements of the second level, the marketer earns 3% of the total memberships of the nine new people that have been brought in (three by each of the three original recruits); this amounts to $9.72 for this level, and, thus, a monthly total of $10.80. The percentage paid downline rises to 8% for the third generation, 9% for the fourth, and 10% for the fifth; it then decreases to 6% for the ninth level. By the time a marketer reaches the ninth generation (at which time 19,683 new members have been signed up for the buyers club), his monthly total of bonuses is $68,935.32. However, with a minimum of 1,000 "active subscribers" in his personal matrix, a marketer at the ninth level earns an 11% bonus on all subscribers in that level. This means that he would earn a monthly total of $104,364.72. Of this amount, $77,944.68 results from the enlistment of the 19,693 new subscribers at the ninth level.

The brochure includes a list of "Subscriber Rules and Regulations." A "subscriber member" is a person who elects to join BEK by paying the monthly fee. An "independent BEK marketer" is a person who chooses to participate in the marketing plan, has completed the required application and training, enrolls new subscribers, and earns monthly bonus checks on his or her "own network of subscribers." Subscribers may terminate their memberships at any time, but may not rejoin for six months after notifying BEK of this decision. There is no charge to become an "independent marketer." The rules state that "[a]ny BEK subscriber who chooses to participate in the network marketing program is eligible" to become an independent marketer.

Reed recalled that he spent about 35 minutes at the August 25, 1987, meeting. While Reed was present, defendant briefly discussed the chance that members would have to buy products at discounts through the club. Overall, defendant spent slightly less than half of the 35 minutes discussing the benefits of joining the buyers club and slightly over half the time explaining memberships, fees, and the marketing matrix. Reed could not recall any specific mention of "fabulous bonuses" or of the possibility of a marketer making about $104,000 per month. Reed talked to several people about the possibility of buying goods through the club, but he decided not to join BEK.

Beverly Bailey, formerly Knop, testified that in 1987 she and defendant, then her husband, founded BEK. She did not remember exactly when BEK was incorporated. Its operations stopped in August 1987, when the Knops were arrested. The charges against Bailey were dismissed before defendant's trial.

Sometime in 1987, defendant first told Bailey about his plan to form BEK. Initially he told her that he was considering starting a marketing system based on the Unimax plan, although Bailey never saw any materials describing Unimax. When defendant started to organize BEK, he told Bailey that people had to pay $50 to join; it was then necessary for everyone who joined to pay $36 monthly and to sign up three more people "to make it work."

Although defendant made her "president" of BEK, Bailey's main work was answering the phone and writing out checks. BEK kept no corporate books of which she was aware, and she testified that she had no control over the corporation.

Bailey attended several of the promotional meetings that defendant arranged. The meeting at Thulen's Pub followed a standard format. The meetings lasted "about an hour, maybe." Defendant discussed both the various products and services that the club would make available at a discount and the "American Dream" marketing matrix. Bailey did not recall how much time defendant allocated to each of the two aspects of BEK. Defendant showed people the brochure. Then (in Bailey's testimony):

> "He would tell them that that [sic] they could make money. That they would have to pay $50.00. *** to get in and it was $36.00 a month and then they got a discount for items. Then they had to come into that matrix *** and they had to sign up three people, you know. I don't know how it worked real well, but—."

According to Bailey, defendant, in explaining the matrix, told audiences that a "new person" had to complete a subscriber application. As defendant explained the marketing program, a person could buy his way to the top of the matrix. For a marketer to receive money by recruiting people into BEK, those he recruited had to remain active, *i.e.*, they had to keep recruiting others as the plan specified.

There was an alternate way to rise to the top of the matrix: paying BEK $25,000 to become a "coordinator." There was no limit to the number of coordinators. On direct examination, Bailey stated that Wayne Quick of Clinton, Iowa, paid to become a coordinator. On cross-examination, Bailey explained that Quick actually paid the money in 1986 to join BEK Chemical, a company that defendant

started in 1986. Defendant then told Quick that Quick could be a marketer in BEK. On redirect examination, Bailey stated "one guy" paid $5,000 to become a coordinator. She knew of this transaction because she deposited the $5,000 check.

On direct examination, Bailey stated that in 1987 BEK received "over $50,000 or so" in new buyers club subscriptions. On cross-examination, she conceded she had no basis for this estimate other than that "quite a few" people joined. She had no idea how many people actually signed up to become part of BEK.

Bailey testified that although she ordered none of the products listed in the brochure, these products were available as the brochure stated. Bailey accompanied defendant to meetings with manufacturers and wholesalers to discuss possible discounts for buyers club members. When she and defendant went to the warehouse of East Moline Bar-Jan Wholesale Products (Bar-Jan), a wholesaler of automotive supplies and other goods, defendant discussed purchasing products from this company, and Bailey saw that the warehouse contained a wide variety of products. Also, defendant told her that BEK was a subscriber, distributor, or marketer for Prepaid Legal Services. However, she did not use this service personally; to her knowledge, neither did BEK.

Bailey testified that she recognized the copies of cancelled checks in the back of the BEK brochure. She admitted that some of these checks were never really negotiated. For instance, a check ostensibly made to Kelly Behrens, Bailey's sister, did not really go to Behrens; defendant simply made this check up to use in his marketing effort. Bailey was sure that defendant had "faked" other checks, including one he signed in her name, to show to prospective customers as proof that people actually received money (from bonuses or buyers club discounts) when they joined BEK. According to Bailey, defendant discussed the use of these checks as he was setting up the sales brochure.

Defendant's first witness, attorney William Shirk, recounted that in May 1987 he and the Knops conferred about the multilevel marketing business defendant planned to organize. Defendant told Shirk that the new organization would be patterned on the Unimax system; Shirk, who knew little about multilevel marketing, was not then familiar with Unimax, and he did no legal investigation into Unimax until after defendant was arrested. Shirk set up a corporation for defendant, but at trial he could not recall whether this corporation was BEK Chemical or BEK.

William Engel, who owned a retail jewelry store in Savanna, testified that in 1987 defendant asked him if he would be interested in selling watches at a discount through defendant's new organization. Engel replied that he would like to study the idea some more. The matter went no further.

Dennis Dopler testified that he was in charge of operating the showroom at Bar-Jan. The court admitted a copy of Bar-Jan's current catalog into evidence. Dopler testified that Bar-Jan had a similar catalog in 1987. Bar-Jan sells a wide variety of products wholesale to businesses; it does not sell directly to consumers. Dopler testified that defendant was a Bar-Jan customer. In 1987, defendant set up an account with Bar-Jan for either BEK Chemical, BEK, or both; Dopler was not sure whether there was any difference between BEK and BEK Chemical.

Vincent Gaffey testified that he had been a distributor for Amway, a multilevel marketer, since 1959. Before BEK was formed, defendant asked Gaffey for advice about multilevel marketing. Gaffey gave him no advice and was uninterested in his plans. Gaffey testified that Amway employees' compensation is based on the volume of products and services they sell. Amway employees do not get extra money simply from recruiting new members into the organization, though they may eventually benefit from the new members' sales of products and services.

Charles Anderson of Savanna testified that he had been an Amway distributor for about 20 years. In 1987, he was (as best he recalled) both a subscriber and distributor for BEK. Anderson was familiar with the BEK brochure. He stated that BEK operated "pretty much" as the brochure said. A BEK subscriber could participate in the buyers club but could not (and need not) sign up new BEK members. By contrast, a distributor (or "marketer") was "a person who sign[ed] up others to be in the distributing end of it." A distributor was not required to sell any products to retail customers. A person did not need to pay just to become a distributor because a distributor's job was simply to sell subscriptions and distributorships. A subscriber could do a marketer's duties, but he could become a marketer for no extra cost by signing the standard marketer's agreement.

According to Anderson, Amway and BEK shared certain characteristics and differed in some respects. In both organizations, how much a person made depended on how hard he worked. Neither organization required a member to sponsor new members. In Amway, Anderson sponsored new members and also sold consumer products. In BEK, Anderson could obtain bonuses for selling at least three sub-

scriptions. While he was in BEK, Anderson did not sell any products; he could not recall at trial whether members of the buyers club could purchase goods directly from wholesalers. As he recollected, a marketer could earn commissions "off of selling products in BEK Marketing."

Glen Doty testified that in 1987, after attending one of defendant's presentations, he joined BEK. He first testified that he signed up as a subscriber, not a marketer, and did not intend to sell subscriptions. However, he admitted that he signed a standard BEK marketer's agreement. Doty joined because he believed that through BEK both he and the Savanna Moose Lodge could obtain needed goods at substantial discounts. However, he was unable to obtain any goods through BEK.

Raymond Frankenberger recalled that BEK began in June or July 1987. By the time Frankenberger attended the meeting at Thulen's Pub, he was a member of the BEK organization. He signed up as both a subscriber and a marketer, paying the usual fee for the former post and obtaining the latter one for no extra cost.

Frankenberger could not recall how long the meeting was or the relative amounts of time defendant spent on explaining the buyers club and explaining the operation of the marketing matrix. When defendant explained the matrix, he used an easel to sketch a diagram that resembled a family tree. There was no end to the levels involved, and a new member ultimately could make a profit by getting other people to join. Frankenberger testified that, as far as he understood, for the program to "pay back," everyone participating had to recruit people into the buyers club.

Frankenberger recounted that neither he nor anyone else ever bought any goods through BEK because, when defendant was arrested, defendant was just lining up wholesalers as part of the beginning stages of BEK. Frankenberger, who was in the vacuum cleaner business at the time, expressed interest to defendant in working with BEK. Before Frankenberger got any further than this expression of interest, defendant was arrested. While BEK was still being formed, defendant took Frankenberger to the Bar-Jan warehouse. Frankenberger spoke with the owner of Bar-Jan. It "sure sounded" to Frankenberger as though defendant and the owner had a business relationship at the time.

Defendant's final witness was Michael Merboth of Savanna, who signed a BEK marketing agreement in 1987. As a BEK marketer, Merboth ran several meetings at which he told people of the benefits of the BEK program. At these meetings, Merboth showed potential

recruits the BEK brochure. He emphasized both selling subscriptions and signing people up to "market the matrix." He was to receive a 40% commission for each person he signed up for the buyers club. A subscriber could buy an item at a discount through BEK. Also, the subscriber could (for example) go to East Moline and buy directly from Bar-Jan.

Merboth acknowledged that there were two ways to benefit from becoming part of the BEK system: by purchasing goods at a discount and by obtaining commissions for recruiting others into the BEK system. The latter opportunity was Merboth's primary motive for joining BEK. Merboth explained that "[w]hat I was looking for was to make money out of the commissions. I was going to get as many people as I could in." The opportunity for commissions was his primary motive because he "saw a chance to become very wealthy with this."

Once people were brought into the matrix, BEK encouraged them to get other people involved. Merboth was familiar with paragraph 31 of the brochure, which stated that, upon each request, a marketer should be able to list at least four people each month to whom the marketer had made his best efforts to sell the program. Merboth knew that for the system to continue new members had to join or stay active. If people quit buying into the system, he would stop receiving his commissions. The marketing structure would get "bigger and bigger." The only way that this process could stop was "if you ran out of people," but that was "an impossibility" because "[e]very time there is a baby born, there is a new network marketing prospect."

After argument, the trial court found defendant guilty of promoting an unlawful pyramid sales scheme. The court concluded that it was bound by the ruling of the Appellate Court, First District, in *People ex rel. Hartigan v. Unimax, Inc.* (1988), 168 Ill. App. 3d 718. The court's memorandum opinion noted that BEK was organized almost identically to Unimax. The opinion concluded that defendant placed substantial emphasis on the "matrix portion" of BEK and that the marketing system "relied upon the illusory promise of wealth based upon the recruitment of additional subscribers." After the court denied defendant's post-trial motion and sentenced him, defendant timely appealed.

On appeal, defendant argues that the State did not prove beyond a reasonable doubt that BEK was a "pyramid sales scheme" forbidden by statute. He argues that the trial court erred in holding that *Unimax* is dispositive of this case. Defendant notes that in *Unimax* the appellate court held only that there was a question of fact

whether the Unimax system was an illegal pyramid sales scheme as defined by the Consumer Fraud and Deceptive Business Practices Act (see 815 ILCS 505/2A (West 1992)). Moreover, although defendant concedes that BEK was closely patterned on the Unimax system, he notes what he believes is a crucial difference: under BEK, a person need not pay a fee to become a marketer who could sell the program to others.

When deciding whether a defendant has been proved guilty beyond a reasonable doubt, we do not retry the defendant; rather, we ask only whether the evidence, when viewed in the light most favorable to the prosecution, is sufficient to convince any rational trier of fact that the elements of the offense were proved beyond a reasonable doubt. (*People v. Collins* (1985), 106 Ill. 2d 237, 261.) We hold that the evidence was sufficient to prove that BEK possessed the essential characteristics of an unlawful pyramid sales scheme. To explain our conclusion, we begin with the language of the statute under which defendant was convicted:

> "§17—7. Promotion of pyramid sales schemes. (a) The term 'pyramid sales scheme' means any plan or operation whereby a person, in exchange for money or other thing of value, acquires the opportunity to receive a benefit or thing of value, which is primarily based upon the inducement of additional persons, by himself or others, regardless of number, to participate in the same plan or operation and is not primarily contingent on the volume or quantity of goods, services, or other property sold or distributed or to be sold or distributed to persons for purposes of resale to consumers. For purposes of this subsection, 'money or thing of value' shall not include payments made for sales demonstration equipment and materials furnished on a nonprofit basis for use in making sales and not for resale.
>
> (b) Any person who knowingly sells, offers to sell, or attempts to sell the right to participate in a pyramid sales scheme commits a Class A misdemeanor." Ill. Rev. Stat. 1987, ch. 38, par. 17—7 (now 720 ILCS 17—7 (West 1992)).

Our primary goal in construing this or any statute is to effectuate the intention of the legislature. (*Stone v. Department of Employment Security Board of Review* (1992), 151 Ill. 2d 257, 261.) We must consider the particular evil that the legislature sought to remedy by passing the law at issue. (*Collins v. Board of Trustees of Firemen's Annuity & Benefit Fund* (1993), 155 Ill. 2d 103, 111.) The best guide to the legislature's intent is the statutory language, which must be given its plain or ordinary meaning. (*Collins*, 155 Ill. 2d at 111.) Here, we may

rely on cases interpreting the Consumer Fraud Act's ban on pyramid sales schemes, as the civil and criminal statutes address the same subject matter and are thus *in pari materia. Stone,* 151 Ill. 2d at 262; *In re Liquidations of Reserve Insurance Co.* (1988), 122 Ill. 2d 555, 559.

The evil that laws against pyramid sales plans seek to remedy has been described thus:

> "Pyramid programs *** which induce a person to participate on the representation that he or she cannot only regain the purchase price, but also reap profits by selling the plan to others, are inherently deceptive and contrary to public policy. [Citations.] The deception arises because the market eventually becomes saturated and the seemingly endless chain must end; consequently, many participants cannot even recoup their investments, let alone make a profit." *People ex rel. Fahner v. Walsh* (1984), 122 Ill. App. 3d 481, 486-87.

See also *People ex rel. Hartigan v. Dynasty System Corp.* (1984), 128 Ill. App. 3d 874, 883, quoting *Walsh,* 122 Ill. App. 3d at 486-87, 461 N.E.2d at 82-83; *Love v. Durastill of Richmond, Inc.* (1991), 242 Va. 186, 189-90, 408 S.E.2d 892, 894-95 (as pyramid expands, number of available new participants diminishes so that late entrants into the operation run out of opportunities to recruit new members).

■ Reading the statutory language straightforwardly, we conclude that a pyramid sales scheme is any plan in which (1) in exchange for "money or *other thing of value*" (2) *a person* acquires the opportunity to receive a benefit or thing of value where *this benefit* received is primarily based upon the inducement of others to participate in the same plan rather than upon the volume of goods to be sold or distributed. The evidence proved that BEK was such a plan.

The trial court could properly conclude that under the BEK matrix system marketers and coordinators (who, it could be inferred, would characteristically also be subscribers) would exchange money or another thing of value—*i.e.,* subscribers' fees, coordinators' fees, or hours of training and sales work that inured to the benefit of defendant and BEK—for a benefit (the "fabulous" and explicitly detailed bonuses) that was based primarily upon inducing others to join the system (either as subscribers or, just as likely, as marketers in search of their own "fabulous bonuses") rather than upon the volume of goods (*e.g.,* discounted watches, automotive parts, Rambo survival knives) ultimately distributed.

Even were we to define "goods to be sold or distributed" generously to mean subscriptions to the buyers club, rather than the services and tangible goods ostensibly available at discount via such sub-

scriptions, we would conclude that the testimony (much of it from defendant's own witnesses) was adequate for the trial court to conclude that the primary inducement for joining BEK at the suggestion of others was to take advantage of the opportunity to enjoy large bonuses from the sale of further memberships rather than to take advantages of the memberships themselves.

Defendant focuses primarily on the sufficiency of the evidence that BEK met the first part of the definition. He argues that because people could become marketers for free, they did not pay money or a thing of value for the opportunity to procure their benefit. There are several flaws to this argument.

■■ First, there was evidence that anyone could, and at least one person did, pay a large sum of money to move up the matrix to become a "coordinator." The statute requires only that "a person" acquired the marketing opportunity in exchange for money. The evidence that at least one person paid to become a marketer would be minimally sufficient to satisfy this part of the statutory definition. As another jurisdiction has held in construing a similar statute, it is not necessary that *all* participants in the multilevel marketing plan gain access through the payment of a specified fee; proof that fewer than all paid to do so would suffice. *Philpot v. State* (Tex. App. 1988), 761 S.W.2d 803, 806.

Moreover, the Appellate Court, Fourth District, has held that it is sufficient that a person pays for the opportunity to participate in a pyramid sales plan even if the person is not *required* to pay for this privilege. (*People ex rel. Hartigan v. Dynasty System Corp.* (1984), 128 Ill. App. 3d 874, 880, following *State ex rel. Edmisten v. Challenge, Inc.* (1981), 54 N.C. App. 513, 516-17, 284 S.E.2d 333, 336.) This rationale applies with particular force, where—as here and in *Dynasty* and *Challenge*—the inherent logic of marketing the system encourages most of the marketers to become subscribers as well.

This leads into the second flaw in defendant's argument. The trial court could infer that, although marketers were not *contractually* required to become subscribers in order to sell subscriptions, they were as a practical matter required to do so, as several testified they had done. A marketer's job was to convince prospective customers that joining the buyers club was a worthwhile endeavor. A marketer who was not himself in the buyers club would be at a major disadvantage in attempting to convince others that they should join an organization to which he declined to belong. Perhaps he could do so by convincing them that the real benefits consisted not in becoming subscribers but in becoming marketers who could make money solely by inducing oth-

ers to subscribe or to become marketers. To the extent that such a strategy succeeded, however, it would simply reinforce the "pyramid" nature of BEK; people would forego subscribing to the buyers club and simply become marketers in the hopes that people further downline ultimately would enable them to move up the matrix and earn steadily greater bonuses. The emphasis of the overall organization would thus move steadily away from either the purchase of memberships (though not from the hopes that someone further down would do so) or the purchases of actual goods or services such as jewelry, blowguns, or discount dinners.

It is noteworthy that even though BEK did not formally require marketers to become subscribers, defendant's very own promotional brochure emphasized that subscribers could use the matrix to earn bonuses that would eventually recoup their membership fees (or better) as these subscribers each used "[w]ord of MOUTH" to induce three friends to join BEK.

Third, the phrase "thing of value" includes more than a monetary fee. The language is not limited to the payment of money or a tangible equivalent. In construing an analogous statute that uses the term "for a consideration" rather than "for money or other thing of value," the Missouri Court of Appeals has held that "consideration" includes the responsibility that a marketer assumes toward the organization and its marketing policies. (*State ex rel. Webster v. Membership Marketing, Inc.* (Mo. App. 1989), 766 S.W.2d 654, 658.) Thus, in *Membership Marketing*, the mere fact that a "sales representative" was not required to buy one of the "5-Star Plus" buyers club memberships that he attempted to market was insufficient to insulate the organization from the prohibition against pyramid schemes.

The trial court had sufficient reason to conclude that the plan at issue here generated the type of evil that the legislature sought to remedy by both the civil and criminal prohibitions against pyramid sales schemes. In holding that a somewhat similar plan was impermissible, the court in *Dynasty* noted that the sales scheme at issue there placed its primary emphasis on recruiting other participants into the downline organization and put little emphasis on the sales of products and services. (*Dynasty*, 128 Ill. App. 3d at 878-79.) Here, despite one witness' insistence that every newborn baby is a potential addition to the marketing matrix, the operation of the multiple-referral system that is the essence of the matrix would in time result in diminishing opportunities for an increasing number of members to recruit new members into the system. All of this would occur without requiring any sale of consumer goods or services or resale of buyers club mem-

berships. Moreover, there was testimony from defense witnesses that the recruiting process would have to keep going for the system to "work" or to "pay back." As the opinions we have discussed observe, these are the fundamental characteristics of prohibited pyramid sales schemes.

The conclusion that BEK was a typical pyramid sales scheme receives reinforcement from a number of facts in evidence. First, two defense witnesses who worked as marketers testified that they induced others not only to become members but also to become marketers themselves. Thus, they were expanding the organization in two respects, as bringing in more marketers would provide more people who could recruit more subscribers.

Second, the evidence allowed the trial court to find that the primary purpose of BEK as a whole was to generate profits through the growth of the customer base and that the buyers club was a sham or a pretext covering this essential purpose. As the State notes on appeal, nobody ever bought any goods through BEK. Defendant's efforts to contact wholesalers and manufacturers seem to have been minimal. Defendant's promotional brochure gave few if any specifics (other than membership costs) about the operation of the buyers club. In contrast to the lack of information about the benefits of discount buying, the promotional brochure goes into extensive detail about the precise amounts of money that subscribers and others stand to earn in "fabulous bonuses" accruing through the operation of the marketing matrix. The brochure stresses that subscribers have the chance to earn $25 or more for each dollar spent and that BEK will give them the chance to "become financially independent."

In finding defendant guilty, the trial court relied heavily on *People ex rel. Hartigan v. Unimax, Inc.* (1988), 168 Ill. App. 3d 718. Although the reasoning in *Unimax* is not absolutely essential to our holding here, we concur in it and believe that *Unimax* provides additional support for the judgment of conviction in this case.

In *Unimax*, the appellate court reversed a trial court holding that, as a matter of law, the defendant's marketing system did not violate the civil prohibition against pyramid sales schemes. The Unimax system was very similar to BEK and, as defendant acknowledges, served as the prototype for BEK. A person could become either a subscriber or a marketer; unlike BEK, Unimax charged an extra fee for those who worked as marketers only.

In reversing the grant of summary judgment, the Appellate Court, First District, stated that the marketing matrix "easily can be viewed" as meeting the criteria for a pyramid scheme as defined by

the Consumer Fraud Act. (*Unimax*, 168 Ill. App. 3d at 723.) The court emphasized that the marketers acquired the opportunity to receive benefits—commissions—that were primarily based on inducing other people to join the system and were not related to the sale of goods or services available through the buyers club. *Unimax*, 168 Ill. App. 3d at 723.

The court rejected Unimax's argument that the plan was not a pyramid scheme because marketers received commissions for selling memberships in the buyers club, as opposed to receiving commissions simply for bringing in more marketers; the court refused to equate memberships in the buyers club with goods and services sold through the buyers club. In so doing, the court noted that Unimax's mode of operation emphasized drawing more people into the organization, an emphasis that the company communicated aggressively to its members. The court also observed that a Unimax marketer's sole means of gain was the recruitment of members into the separate buyers club. *Unimax*, 168 Ill. App. 3d at 723-25.

Defendant is technically correct that the first district did not declare that Unimax was a pyramid sales scheme but only that the trial court had erred in holding as a matter of law that the Unimax system was not such a forbidden scheme. Strictly speaking, the only question before the appellate court was whether the trial court was correct in granting summary judgment for Unimax (apparently, the State had not moved for summary judgment against Unimax). Nonetheless, any fair reading of *Unimax* supports the trial court's decision in this case. The only difference between Unimax and BEK that might be relevant is that BEK does not charge a separate monetary fee for the opportunity to become a marketer. It is this difference upon which defendant relies on appeal. For a variety of reasons enunciated at some length earlier, we have rejected this attempt to distinguish BEK from either the Unimax system or the definition of "pyramid sales scheme" in the statute under which defendant was convicted.

The judgment of the circuit court of Carroll County is affirmed.

Affirmed.

BOWMAN and COLWELL, JJ., concur.