**MOTOROLA CREDIT CORPORATION and Nokia Corporation, Plaintiffs,**

v.

**Kemal UZAN, Cem Cengiz Uzan, Marat Hakan Uzan, Melahat Uzan, Aysegul Akay, Antonio Luna Betancourt, Unikom Iletism Hizmetleri Pazarlama A.S., Standart Pazarlama A.S., and Standart Telekomunikasyon Bilgisayar Hizmetleri A.S., Defendants.**

**No. 02 CIV. 666(JSR).**

United States District Court, S.D. New York.

May 20, 2002.

---

Steven Davidson, Gordon M. Clay, John O'Connor, Howard Stahl, Steptoe & Johnson, LLP, Washington, DC, for Motorola.

Mishell B. Kneeland, Paul Fishman, Friedman, Kaplan, Seiler & Adelman LLP, New York City, Allison G. Kort, Jason Brown, Holland & Knight LLP, New York City, for Nokia.

Robert F. Serio, Mark Holton, Gibson, Dunn & Crutcher, New York City, David Rosenberg, Marcus, Rosenberg & Diamond LLP, New York City, for Defendants.

## OPINION

RAKOFF, District Judge.

When business deals go sour, both sides are apt to cry "fraud," and courts know better than to take such claims at face

value. But here we have the unusual case where every preliminary indication is that the defendants, behind a facade of legitimacy, engaged in repeated acts of fraud and chicanery, and thereby perpetrated, and continue to perpetrate, a rather massive swindle.

Plaintiffs Motorola Credit Corporation ("Motorola") and Nokia Corporation ("Nokia") are large, multinational companies that, together with their affiliates, are involved, *inter alia*, in the sale of cellular telephone equipment. The individual defendants—Kemal Uzan, Cem Cengiz Uzan, Murat Hakan Uzan, Melahat Uzan, Aysegul Akay, and Antonio Luna Betancourt— are members (or, in Betancourt's case, a close associate) of a prominent Turkish family, the Uzans, who control various Turkish businesses, including, *inter alia*, the three Turkish companies named as corporate defendants here and a large Turkish cellular telephone company called Telsim Mobil Telekomunikasyon Hizmetleri A.S. ("Telsim"). The plaintiffs allege, in essence, that the defendants, through a pattern of fraud, extortion, and other unlawful activities, are in the process of defrauding plaintiffs of more than $2.7 billion that plaintiffs lent to Telsim. To prevent defendants from further diverting and depleting such assets as might be available to repay this great sum, plaintiffs seek, in addition to damages, extensive preliminary injunctive relief, including, *inter alia*, the attachment of various New York properties and the deposit in the registry of this Court of certain Telsim shares held by defendant Standart Telekomunikasyon Bilgisayar Hizmetleri A.S. ("Standart Telekom") and pledged as collateral for the loans.

Following extensive briefing and a lengthy evidentiary hearing extending over six days, the Court, by orders issued May 9 and 10, 2002, concluded that plaintiffs were entitled to the preliminary relief they sought. This Opinion states the reasons for those rulings.

■ In the Second Circuit, a party seeking preliminary injunctive relief must demonstrate, first, that it will suffer irreparable harm in the absence of such relief, and, second, that either (a) there is a likelihood that the movant will succeed on the merits of its underlying claims or (b) there is a sufficiently serious question going to the merits of those claims as to make them a fair ground for litigation, coupled with a balance of hardships tipping decidedly in the movant's favor. *See, e.g., Random House, Inc. v. Rosetta Books LLC*, 283 F.3d 490, 490 (2d Cir.2002) (per curiam); *Brenntag Int'l Chemicals, Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999). Where, moreover, the movant is seeking a "mandatory," rather than "prohibitory" injunction—*i.e.*, an injunction that will alter, rather than maintain the status quo or that will provide the movant with relief that cannot be undone, *see Beal v. Stern*, 184 F.3d 117, 122 (2d Cir.1999)— the movant must, in satisfying the aforementioned standard, either demonstrate a "clear" or "substantial" likelihood of success or show that "extreme or very serious damage" will result from a denial of the injunction. *See, e.g., Beal*, 184 F.3d at 122–23; *Phillip v. Fairfield Univ.*, 118 F.3d 131, 133 (2d Cir.1997).

Although "[t]he distinction between mandatory and prohibitory injunctions is not without ambiguities," *Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 34 (2d Cir.1995), the Court is doubtful that what plaintiffs here seek is properly classified as "mandatory" injunctive relief, since in essence they are simply seeking to preserve the status quo by ensuring that certain assets otherwise available to satisfy a judgment but threatened with being dissipated are effectively fro-

zen—even if this means, in the case of the Telsim stock owned by Standart Telekom, moving it into the Court's registry. But even assuming *arguendo* that some of the injunctive relief here sought could be viewed as "mandatory," the Court finds that plaintiffs satisfy the heightened standard requisite thereto. In particular, the Court, based in substantial part on its assessments of the credibility (or lack thereof) of the parties' respective witnesses who testified at the preliminary injunction hearing and the corresponding inferences (positive or adverse, as the case may be) that the Court drew from those assessments, finds that plaintiffs have clearly demonstrated that they are substantially likely to succeed on the merits of their claims, and have further demonstrated that very serious damage is likely to result if the requested relief is not granted.[1]

■ Plaintiffs first four causes of action allege violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.* A threshold issue is whether injunctive relief is available to a private plaintiff bringing a civil action under RICO. The Second Circuit has never definitively ruled on the issue, but the two other circuits that have squarely decided it are divided on the result—*see Religious Technology Center v. Wollersheim,* 796 F.2d 1076 (9th Cir.1986) (denying injunctive relief); *NOW, Inc. v. Scheidler,* 267 F.3d 687 (7th Cir.2001) (granting injunctive relief)—and the Supreme Court recently granted certiorari in the latter case to resolve the split, *see Scheidler v. National Organization for Women, Inc.,* —— U.S. ——, 122 S.Ct. 1604, —— L.Ed.2d —— (2002).

While the instant Court would gladly avoid the issue until the Supreme Court rules, that is not possible, for even though (as discussed *infra* ) Motorola has an independent entitlement to injunctive relief under its state law claims, co-plaintiff Nokia has brought claims here only under RICO and a certain percentage of the Telsim stock that plaintiffs seek to transfer to this Court's registry is claimed as collateral by Nokia alone. Thus, at least so far as Nokia's application for injunctive relief is concerned, the issue of the availability of injunctive relief to a private RICO plaintiff must be decided now.

In concluding that injunctive relief was not available to private RICO plaintiffs, the Ninth Circuit in *Wollersheim* relied heavily on extended inferences drawn from what the Seventh Circuit in *Scheidler* described as mere "snippets of legislative history." *Scheidler,* 267 F.3d at 699. In reaching the opposite result, the Seventh Circuit relied on what it characterized as the "unambiguous statutory language" of the applicable section of RICO, § 1964. *Id.* The present Court agrees with the result in *Scheidler,* but for somewhat different reasons.

As even the court in *Wollersheim* recognized, the right to grant injunctive relief in private civil actions in accordance with traditional principles of equity jurisdiction is one of the equitable powers given to federal courts by the Judiciary Act of 1789. *See Wollersheim,* 796 F.2d at 1083; *see generally, Grupo Mexicano de Desarrollo, S.A.*

---

1. Each of the Court's more specific findings, set forth at various places *infra,* reflects a determination that the Court credited the testimony or other evidence cited in support of such finding (as well as, in most instances, additional supportive evidence not cited for the sake of brevity) and that the Court discredited any contrary evidence. Overall, the Court, based on its assessment of the witnesses' demeanor, consistency, and responsiveness, found plaintiffs' witnesses highly credible and defendants' witnesses frequently lacking in credibility.

*v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 318–19, 119 S.Ct. 1961, 144 L.Ed.2d 319 (1999). It would be extraordinary indeed if Congress, in enacting a statute that Congress expressly specified was to be "liberally construed to effectuate its remedial purposes," Pub.L. NO.91–452, § 904(a), 84 Stat. 947 (1970), intended, without expressly so stating, to deprive the district courts of this utilizing this classic remedial power in private civil actions brought under the act. Whether or not the language of § 1964 expressly confers this power as "unambiguously" as the Seventh Circuit asserts, it nowhere expressly denies courts this power in private civil actions, and thus the normal presumption favoring a court's retention of all powers granted by the Judiciary Act of 1789 prevails.

Furthermore, the Ninth Circuit's reading in *Wollersheim* of RICO's legislative history is far too narrow and wooden. RICO was originally conceived as a statute that would provide the Government, alone, with both criminal and civil remedies, with the former set forth in what became § 1963 and the latter in what became subsections (a) and (b) of § 1964. *See Sedima, S.P.L.R. v. Imrex Company, Inc.*, 473 U.S. 479, 487, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985); *see generally* Jed S. Rakoff & Howard W. Goldstein (eds.), *RICO: Civil and Criminal Law & Strategy* § 1.01 (1989). Specifically, subsection (a) of § 1964 made express what was already inherent—that in civil RICO actions, as in other civil actions, the federal district courts have broad equitable powers. If anything, subsection (a) extended the courts' equitable jurisdiction in civil RICO actions beyond what was granted by the Judiciary Act of 1789, while subsection (b) gave the Government the right to bring such actions.

Since, however, the Government was not a victim and had not suffered any loss, there was no reference to damages in the original version of RICO that passed the Senate. It was only relatively late in the legislative process that the House added an amendment to give victims of racketeering activity a private right of action, and this amendment, which was copied from the Clayton Act and provided for treble damages, was tacked on to § 1964 in what is now subsection (c) thereof. *See Sedima*, 473 U.S. at 487–88, 105 S.Ct. 3275.

Taken overall, then, what clearly emerges from the legislative history is that Congress intended to give private civil litigants a right to sue under RICO and that, since the Act nowhere else specified damages, this was expressly included in the amendment. But to go further and to suggest that Congress in so amending § 1964 to add a private right of action for damages thereby intended to deprive the district courts of applying to private civil RICO cases the courts' equitable powers and jurisdiction that subsection (a) of the Act so broadly affirmed is to push the legislative history far beyond what it can reasonably support.

Accordingly, the Court concludes that the instant plaintiffs may seek injunctive relief pursuant to their RICO claims.

■ While plaintiffs bring such claims here under each of the four subsections of RICO's "Prohibited Acts" section, § 1962, it is enough for present purposes to evaluate their likelihood of success under any of those claims, for each is broad enough to support the injunctive relief here sought. Consider Count III of the Complaint, which alleges that the defendants conducted the affairs of one or more enterprises through a pattern of racketeering activity and thereby caused economic injury to plaintiffs. *See* Complaint, ¶¶ 286–88. The Court finds that the plaintiffs have shown,

by clear and convincing evidence, each essential element of this claim.

Of the two RICO enterprises alleged in the Complaint, the one that most particularly fits Count III is the "Uzan Association Enterprise," which the Complaint defines as an association in fact of the Uzans, their associates, and the various companies they control, including the named corporate defendants, Telsim, and such other companies as Rumeli Holding A.S., a holding company through which the Uzans exercise control over numerous entities. *See* Complaint ¶¶ 24–25, 242, 286.

At the hearing on the instant motion, the plaintiffs established, virtually without contradiction, that this Uzan-controlled business empire functioned as ongoing enterprise, with its own structure and hierarchy antedating and independent of the racketeering activities here alleged. *See, e.g., United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981); *U.S. v. Coonan,* 938 F.2d 1553, 1559 (2d Cir.1991). Each Sunday night, key members of the Uzan family would sit down to a dinner meeting at which the key business decisions were made with respect to the entire enterprise, with individual members of the family, including the individual defendants here, then delegated to carry out the decisions. *See, e.g.,* transcript at preliminary injunction hearing ("tr.") at 59, 423. At the some time, even those individual members of the family who functioned as chief executive officers of particular business entities within the enterprise could not make major decisions without checking, not with their respective boards of directors (although those were also Uzan-controlled), but with the family hierarchy. *See, e.g.,* tr. 10, 27–29, 421–23, 857, 967–68.

Each of the defendants here was associated with the enterprise, and in the case of the individual defendants played a dominant role; but the enterprise itself was considerably greater than, and distinct from, any or all of the defendants. By virtue of their respective roles, however, the defendants were in a position to conduct the affairs of the enterprise, and, as the evidence here showed, that conduct sometimes consisted of racketeering activities.

So far as the plaintiffs here are concerned, defendants' racketeering activities primarily took the form of fraudulent schemes, in the execution of which, among numerous other means, international wire communications between Europe and New York were utilized, in violation of the wire fraud statute, 18 U.S.C. § 1343. (A partial listing of applicable wire transfers is appended as Attachment E to the Complaint). In particular, over a period of several years (beginning, in Motorola's case, as early as 1998), each of the plaintiffs (in ignorance of the other), was fraudulently induced to make to Telsim ever greater loans, and to forego repayment of prior loans, based on false representations that:

(i) the proceeds were to be used by Telsim for certain specified purposes (such as purchase of cellular telephone equipment from the plaintiffs), *see, e.g.,* tr. 869–71, 1221–22, *see also,* plaintiffs' exhibit ("Pl.Ex.") 79, defendants' exhibit ("Def. Ex.") 74;

(ii) Telsim's financial and business circumstances were sound and it was on the verge of being acquired or funded by other sound companies, *see, e.g.,* Pl.Ex. 64, 72, 75, 76, 78–79, 81, 85–87; and

(iii) plaintiffs' loans were fully collateralized by Telsim stock, *see, e.g.,* Pl.Ex. 75, 79; tr. 14.

In actuality, however, as the proof at the preliminary injunction hearing clearly established:

(i) at least $1 billion of the $2.7 billion loaned to Telsim by plaintiffs is unaccounted for, with some of it admittedly used for purposes other than those specified in the loan documents, *see e.g.,* Pl.Ex. 79; tr. 713, 870, 957–959, 1221, 1261, and much of it seemingly diverted by defendants to the benefit of the Uzan Association Enterprise, *see, e.g.,* tr. 56–59;

(ii) Telsim's financial condition was increasingly precarious (long before any alleged "crisis" in the Turkish economy on which defendants now seek to rely to conceal their fraud), *see, e.g.,* tr. 938–940, and its prospects for effecting a sale or merger of the company were far more remote than represented, *see, e.g.,* tr. 42–44, 53, 73–74, 938–940—facts which the defendants helped conceal from plaintiffs by withholding important financial data and by preventing plaintiffs from having meaningful access to third parties familiar with Telsim's merger prospects, *see, e.g.,* Pl.Ex. 87, 91; tr. 11, 83–84, 86–88; and,

(iii) defendants secretly and fraudulently diluted the value of plaintiffs' collateral, *see* Pl.Ex. 14, 36; tr. 89, 466.

This latter event was a particularly raw bit of business that well illustrates the defendants' fraudulent intent and their willingness to make use of the Uzan Association Enterprise to achieve their fraudulent purposes. Prior to the meeting, over 95% of the shares of Telsim were owned by two Uzan-controlled entities: Rumeli Holding, which owned 21.99% of the Telsim stock, and Rumeli Telefon Sistemleri A.S. ("Rumeli Telefon"), which owned a controlling 73.63% of the Telsim stock. Virtually the entirety of the Telsim stock owned by Rumeli Telefon had, in turn, been pledged to Motorola and Nokia as collateral for their loans to Telsim. In inducing the plaintiffs to make ever greater loans, and in quieting plaintiffs' ever-growing fears about repayment, the Uzans repeatedly emphasized that, if all else failed, plaintiffs were fully protected by the value of this collateral. See, e.g., Pl. Ex. 75, 79; tr. 14.

Eventually, however, as plaintiffs slowly learned more and more suspicious circumstances, it became ever more probable that plaintiffs would finally demand repayment and/or foreclose on the collateral. When this at last appeared imminent, the defendants, making use of the multiple opportunities afforded by the Uzan Association Enterprise to shift assets and ownership, convened on April 24, 2001, without the slightest notice to plaintiffs, a specially-called meeting of Telsim's shareholders, *see* tr. 81–82. At the meeting, the shareholders issued new shares that tripled the number of outstanding Telsim shares, but gave the prior shareholders "preemption rights" to purchase the new shares up to a level that would enable them to retain proportions of ownership corresponding to their prior percentages of ownership. Rumeli Telefon, however, "waived" its preemption rights, whereupon those rights were transferred to another Uzan-controlled entity, defendant Standard Telefon, which previously had owned only 0.32% of the Telsim stock. Standard Telefon then exercised the rights so transferred, thus magically increasing its percentage of Telsim stock to a controlling 66.48%. Meanwhile, the Telsim stock retained by Rumeli Telefon (and pledged to the plaintiffs) was reduced to 24.54% of the total shares, *i.e.,* one third of the original ownership. *See* Pl.Ex. 36; *see also,* tr. 598.

The net effect of this palpable fraud was to hugely dilute the value of plaintiffs' collateral, as well as effectively divesting them of such control of Telsim as they might have otherwise achieved if they had foreclosed on the collateral. Recognizing the fraudulence of their acts, moreover, the defendants not only kept the events of

April 24 secret from the plaintiffs (with whom they were in regular contact), *see, e.g.,* tr. 89, 466, 1204, but also did not even tell Telsim's chief financial officer, Fatih Azami, until several weeks had passed, *see* tr. 854.[2] As this also evidences, Telsim itself was but a pawn in the Uzan Association Enterprise.

As for defendants' contention the issuance of the new shares was simply motivated by legal concerns over maintaining a sufficient capitalization to meet new Turkish investment certificate requirements, both plaintiffs' and defendants' Turkish law experts testified that, if such recapitalization was required at all for this purpose, it was not required, at the earliest, before December 2001, *see* tr. 610, 985. Moreover, nothing in the alleged recapitalization requirement required dilution of the proportionate value of the collateral, let alone keeping this secret from plaintiffs. The Court rejects the proffered excuse as itself nothing but a sham.

Eventually, plaintiffs learned of the dilution, and, with their suspicions now fully aroused, began investigating whether they had indeed been defrauded. *See, e.g.,* tr. 90–97, 103, 467–468. Defendants retaliated by use of fear and extortion, and thereby violated another RICO predicate, the Hobbs Act, 18 U.S.C. § 1951. Specifically, the defendants arranged for a lawyer for the Uzan family to initiate Turkish criminal proceedings against the executive hierarchy of both Motorola and Nokia, accusing them, in a sworn complaint that is frivolous on its face and unsupported by a single credible fact of record, of making "explicit and armed threats to kill" the Uzan family. Pl.Ex. 99. Attempting to utilize the fear thereby engendered (especially since several of the executives so accused were within Turkish jurisdiction), *see* tr. 1067–69, the defendants then informed plaintiffs that, if only plaintiffs would agree to defer seeking repayment of the overdue loans, defendants would arrange to have the criminal charges dropped, *see* tr. 90–93. As this testimony (which the Court fully credits) well illustrates, this was a classic extortion scheme in clear violation of the Hobbs Act. *See, e.g., United States v. Abelis,* 146 F.3d 73, 82 (2d Cir.1998).[3]

From the foregoing alone (and there is much more), it is clear that defendants have for several years now conducted the affairs of the Uzan Association Enterpirse through a pattern of racketeering activities and have thereby directly and proximately injured plaintiffs, who not only relied to their detriment on defendants' false representations but who have now seen their monies diverted from Telsim and the Telsim shares on which they ultimately relied for repayment diluted to a small fraction of their former value.

Moreover, defendants' open-ended racketeering scheme continues apace, threatening still further injury to plaintiffs'

**2.** Remarkably, none of the Uzan defendants, even the one (Cem Uzan) who is not challenging the Court's personal jurisdiction, chose to appear at the preliminary injunction hearing—a fact from which the Court draws the obvious adverse inferences. Instead, they sent poor Mr. Azami, who, as the above testimony indicates, was kept in the dark by the Uzans as to critical decisions.

**3.** While some lower courts have held that the threat of civil litigation or even the initiation of unjustified civil lawsuits does not constitute a Hobbs Act predicate act under RICO, *see, e.g., G–I Holdings, Inc. v. Baron & Budd,* 179 F.Supp.2d 233, 259 (S.D.N.Y.2001); *Nakahara v. Bal,* 1998 WL 35123, at *7 (S.D.N.Y. Jan.30, 1998), none of these cases (which, in any event, are not binding on this Court) involved, as here, the perjurious obtaining of a criminal charge in order to induce physical fear immediately used to try to extort economic concessions.

business and property. For example, as recently as January of this year, the defendants arranged, in another unannounced Telsim shareholders' meeting, for the voting rights of the remaining Telsim shares pledged to plaintiffs to be diminished, while the voting rights of the unencumbered shares were greatly increased, thus further reducing plaintiffs' opportunity for recovery (and further increasing the need for injunctive relief by this Court).[4] *See* Pl.Ex. 39, *see also,* tr. 610–615.

This step was taken, moreover, in the teeth of defendants' repeated promises—never fulfilled—to restore plaintiffs' collateral to its original status. *See, e.g.,* tr. 89, 90, 101, 467–469, 861; *see also,* Pl.Ex. 100, 101. Indeed, the Court finds that defendants, by repeatedly making these representations even during the course of this litigation while taking no actions to fulfill their pledge and instead offering sham excuses and false testimony, have carried their fraud into the court itself.

Under these circumstances, it is clear that plaintiffs are likely to suffer severe

further injury if the Court does not grant the requested injunctive relief necessary to preserve the status quo and prevent any further diversion or diminution of the assets available for repayment. *See, e.g., Brenntag,* 175 F.3d at 249, *Republic of Philippines v. Marcos,* 806 F.2d 344, 356 (2d Cir.1986) ("preliminary injunctions are proper to prevent a defendant from making a judgment uncollectable").

In short, plaintiffs, having clearly demonstrated that they are substantially likely to succeed on their RICO claim under Count III, and having further demonstrated that, in the absence of the requested relief, they are likely to suffer severe injury, are fully entitled to the relief here sought.[5]

■ Defendants, however, in addition to challenging the availability of private injunctive relief under RICO (as discussed *supra*) also argue that the plaintiffs lack standing at this time either to bring their RICO claims or to seek injunctive relief predicated on those claims, because they have not exhausted their legal remedies

4. After plaintiffs commenced this lawsuit on January 28, 2002, defendants asserted that the January resolution had never become "effective." *see* tr. 1287. Under all the facts and circumstances, the Court draws the inference that defendants did not implement the resolution only because it would further expose their fraud in the eyes of the Court, and that, unless prevented by appropriate injunctive relief, they will likely seek an opportunity to implement the resolution in the future.

5. While, given the Court's findings that plaintiffs are substantially likely to prevail on their claims, there is no need to assess any alleged hardship to defendants from the requested injunctive relief, in fact there is none. (Defendants are, moreover, fully protected against any error in this Court's ruling by their right to immediate appeal and by the very substantial bond of $ 2,000,000 that the Court has ordered plaintiffs to post.) Although defendants argue that the placement

of the Telsim shares in this Court's registry could negatively impact Telsim's telecommunications license because of a Turkish requirement of 50% Turkish ownership, the Court is, needless to say, neither assuming ownership itself nor transferring it at this time, so that the Turkish requirement continues to be met. Indeed, the Turkish Ministry of Telecommunication and Transportation had previously made clear that there was no prohibition to the very shares in question being held in escrow in a Swiss bank in connection with certain arbitration proceedings that might arise (discussed *infra*). *See* Pl.Ex. 57, 58. The Court, moreover, credits plaintiffs' expert's opinion that such transfer would present no problem under Turkish law. Tr. 616–620. By contrast, defendants' expert, while contending that the transfer would present problems, was obliged to concede that the Turkish Ministry had effectively rejected his interpretation. Tr. 1003–04.

against Telsim nor thereby ascertained precisely what their RICO damages will be, *see First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 768 (2d Cir. 1994). In *First Nationwide*, however, the plaintiff sought to bring a RICO claim against the very borrower on whose collateral the plaintiff had not yet fully foreclosed and as to whom ordinary collection proceedings were far from completed. Here, by contrast, the borrower (Telsim) is not a party at all, and the named defendants, who are accused, *inter alia*, of fraudulently inducing the plaintiffs to extend the $2.7 billion in loans and of diverting it to their benefit, are independently liable for this known and certain sum, regardless of whether plaintiffs pursue their alternative remedies against Telsim or not. Similarly, even the portion of the injunctive relief relating to Telsim stock is relief sought, as a practical matter, not from Telsim, but from the current owners of the stock and from those who, by controlling the Uzan Association Enterprise, are in a position to divert Telsim's monies and diminish the value of plaintiffs' collateral. *See GICC Capital Corp. v. Technology Fin. Group, Inc.*, 30 F.3d 289, 293 (2d Cir.1994) ("when a corporation fraudulently is caused to issue debt and stripped of its assets in a manner that obviously will leave the creditors unpaid, those creditors have [RICO] standing"); *see also In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 59 (2d Cir.1998) (distinguishing *First Nationwide* on other grounds).

██ Beyond all this, Motorola is independently entitled to the injunctive relief it here seeks by virtue of its Illinois state and common law claims against defendants, including, *inter alia*, claims for common law fraud (Count V), promissory fraud (Count VI), and civil conspiracy (Count VII).[6] From the foregoing recitations, it is clear that plaintiffs have shown a likelihood of success under each of these claims, and neither side questions the fact that Illinois law empowers courts to impose the full range of injunctive relief to prevent irreparable harm. *See, e.g., Caterpillar, Inc. v. Jerryco Footwear, Inc.*, 880 F.Supp. 578, 587 (C.D.Ill.1994); *People ex rel. Hartigan v. Dynasty System Corp.*, 128 Ill.App.3d 874, 83 Ill.Dec. 937, 471 N.E.2d 236 (4th Dist.1984). Moreover, the Illinois claims are in no way subject to such limitations as may arguably exist with respect to the RICO claims by virtue of *First Nationwide*. *See, e.g., Bank of Ravenswood v. City of Chicago*, 307 Ill.App.3d 161, 240 Ill.Dec. 385, 717 N.E.2d 478, 483–84 (1st Dist.1999) ("cause of action accrues at the time [the plaintiff's] interest is invaded; the mere fact that the extent of its damages is not immediately ascertainable does not postpone the accrual of a plaintiff's claim"); *see also Austin v. House of Vision, Inc.*, 101 Ill.App.2d 251, 256, 243 N.E.2d 297 (1st Dist.1968) ("Illinois courts have held that an action sounding in tort accrues at, and limitations begin to run from, the date on which there is a wrongful invasion of personal or property rights, regardless of the time when the full extent of the injury or damages sustained is ascertained").

---

6. While two of these claims are brought against defendants Hakan Uzan and Cem Cengiz Uzan alone, the claim for civil conspiracy is brought against all defendants. Moreover, the proof before the Court shows that Hakan Uzan and Cem Uzan stand, along with their father Kemal Uzan, at the very pinnacle of the Uzan business empire, and a court applying Illinois law can impose injunctive remedies against not only named defendants but also those acting in concert with them or subject to their control. *See, e.g., People ex rel. Scott v. Master Barbers & Beauty Culturists Ass'n.*, 9 Ill.App.3d 981, 293 N.E.2d 393, 397 (1973).

While defendants offer a hodgepodge of other objections to plaintiffs' motion for preliminary injunctive relief—all of which have been considered, and rejected, by the Court—only a few deserve mention here.

■ *First,* defendants renew their argument, previously rejected by the Court in its Order dated February 15, 2002, that, under the doctrine of *Grupo Mexicano, supra,* this Court lacks authority to issue a preliminary injunction preventing petitioners from disposing of their assets pending adjudication of plaintiffs' claim for damages. *Grupo Mexicano,* however, was addressed to the situation where an unsecured creditor seeks to restrain the general assets of its debtor in aid of collecting the debt. Since the Judiciary Act of 1789 conveyed to federal courts only the equity jurisdiction exercised by the High Court of Chancery in England at that time, and since, at that time, a general unsecured creditor was not entitled to such a prior restraint of a debtor's assets, the Supreme Court held in *Grupo Mexicano* that a federal court lacked power to issue such an injunction. *Grupo Mexicano,* 527 U.S. at 318, 119 S.Ct. 1961 ff. By contrast, however, as the Supreme Court in *Grupo Mexicano* further indicated, such equitable remedies are available, both historically and now, to creditors possessing a lien or equitable interest in the property at issue, *see Grupo Mexicano* at 329–33, 119 S.Ct. 1961, and subsequent decisions have expressly so held. *See Wishnatzki & Nathel, Inc. v. H.P. Island–Wide, Inc.,* 2000 WL 1610790, *1–2 (S.D.N.Y. October 27, 2000) (and cases there cited); *see also Deckert v. Independence Shares Corporation,* 311 U.S. 282, 289, 61 S.Ct. 229, 85 L.Ed. 189 (1940). Here, the portions of plaintiffs' requested preliminary relief that defendants chiefly challenge—*i.e.,* the transfer to this Court's registry, in aid of a proposed constructive trust, *see* Compl.

at ¶ 337, of the Telsim shares held by defendant Standart Telekom that are pledged as collateral for plaintiffs' loans, as well as restraints on defendants' ability to further transfer or dilute the stock—are equitable remedies sought in aid of preserving an asset in which the plaintiffs have an acknowledged equitable interest. Accordingly, the doctrine of *Grupo Mexicano* poses no bar to the requested relief.

■ Furthermore, even if (contrary to fact) such relief were not available under the Court's general equitable powers conveyed by the Judiciary Act of 1789, it would be available under the specific grant of power given by Congress under § 1964(a) of RICO, which expressly provides that the "district courts of the United States shall have jurisdiction to prevent and restrain violations of section 1962 of this chapter by issuing appropriate orders, including, but not limited to: ordering any person to divest himself of any interest, direct or indirect, in any enterprise; [and] imposing reasonable restrictions on the future activities or investments of any person; ...." Finally, because Illinois law, as previously noted, clearly permits such injunctive relief, it would be available in a federal court that, as here, has jurisdiction over an Illinois claim. *See Grupo Mexicano,* 527 at 319 n. 3, 119 S.Ct. 1961 (noting that this argument was not there preserved).

■ *Second,* defendants argue that this entire case is simply an "end run" around the contractual agreements between plaintiffs and Telsim to submit any disputes to arbitration in Switzerland, and that, consequently, this Court has no jurisdiction to entertain this action. But, as the foregoing findings of fact make evident, plaintiffs have already demonstrated a clear likelihood of success on their contentions, *inter alia,* that the Telsim contracts were induced by fraud and that the instant defen-

dants, rather than Telsim, were the real parties in interest, operating outside the confines of Telsim and using it simply as a front. Consequently, the arbitration provisions of the Telsim contracts are a total irrelevancy.

Furthermore, even if this were not so, the arbitration clause in the contract between Motorola and Telsim expressly provides that "nothing in this section will prevent either party from resorting to judicial proceedings if ... interim relief from a court is necessary to prevent serious and irreparable injury to one party or to others." Def. Ex. 5. While the situation with respect to Nokia is more complicated, both because Nokia, though the real party in interest, made its loans via an intermediary, ABN–AMRO Bank, N.V. ("ABN"), and also because the corresponding contracts do not contain as explicit a grant as the above-quoted clause, nevertheless, "entertaining an application for a preliminary injunction in aid of arbitration is consistent with the court's power ...." *Borden, Inc. v. Meiji Milk Products, Co.*, 919 F.2d 822, 826 (2d Cir.1990).

*Third*, all defendants except Cem Cengiz Uzan (who concedes the Court's personal jurisdiction) argue that the Court lacks personal jurisdiction over them and therefore lacks jurisdiction to impose any restraint upon them. But the Complaint adequately alleges personal jurisdiction, and this is sufficient until the matter is properly challenged on an evidentiary basis. Defendants, indeed, propose to mount such a challenge, but on their own volition have chosen to schedule the briefing and argument of that motion for several weeks hence. For them to raise the same objection here is therefore premature.

That said, it may also be noted that, even at the hearing on the preliminary injunction, plaintiffs adduced considerable evidence indicating their personal jurisdiction over all defendants, both under RICO, see 18 U.S.C. § 1965, and under the applicable law of New York. Among much else, there was ample evidence that most of the individual defendants reside in New York, have New York driver's licenses, maintain New York bank accounts, and do business in New York, as well as serving as principals for the corporate defendants. *See Dixon v. Mack*, 507 F.Supp. 345, 350 (S.D.N.Y.1980).

■ Furthermore, even if any defendant succeeds in convincing the Court, in the forthcoming motion practice on personal jurisdiction, that the plaintiffs have failed to carry their burden of establishing personal jurisdiction over that particular defendant, so that that defendant must be dismissed from the lawsuit, even that defendant may still be subject to the injunctive relief already granted to the extent that he, she, or it is acting in concert with a defendant properly before the Court.

■ *Fourth*, defendants argue that injunctive relief must be denied because of plaintiffs' failure to join two parties allegedly indispensable to the granting of such relief, namely, Telsim and Rumeli Telefon. But while these two entities will undoubtedly figure in this lawsuit, they are in no sense indispensable to a lawsuit that neither seeks relief from them nor threatens to affect them more than tangentially. In particular, the Telsim shares that are the focus of the contested injunctive relief are owned by Standart Telekom and controlled by the Uzan family. More generally, even to the extent that Telsim and Rumeli Telefon are indirectly implicated in this lawsuit, the Court sees little reason to conclude that their interests will not be more than adequately represented by the individual defendants in this suit who, as ma-

jority shareowners in both corporations, have heavily aligned interests.[7]

Accordingly, for the foregoing reasons, the Court hereby reaffirms its Orders of May 9 and May 10, 2002 granting plaintiffs' requested relief.

---

7. To the extent that defendants also contend that ABN is also an indispensable party, the Court can see no reason why its interests will not be adequately represented by Nokia which is the real party in interest with respect to the loans that ABN extended to Telsim. *See* tr. 415–416, 441, 495.