**MOTOROLA CREDIT CORPORATION and Nokia Corporation, Plaintiffs–Appellees,**

v.

**Kemal UZAN, Cem Cengiz Uzan, Murat Hakan Uzan, Melahat Uzan, Aysegul Akay, Antonio Luna Betancourt, Unikom Iletism Hizmetleri, Standart Pazarlama A.S. and Standart Telekomunikasyon Bilgisayar Hizmetleri A.S., Defendants–Appellants.**

**Motorola Credit Corporation and Nokia Corporation, Plaintiffs–Counter–Defendants–Appellees,**

v.

**Murat Hakan Uzan and Cem Cengiz Uzan, Defendants–Counter–Claimants–Appellants,**

Kemal Uzan, Melahat Uzan, Aysegul Akay, Antonio Luna Betancourt, Unikom Iletism Hiametleri Pazarlama A.S., Standart Pazarlama A.S., Standart Telekomunikasyon Bilgisayar Hizmetleri A.S., Defendants—Appellants,

Motorola, Inc., Kroll Associates, Inc., Christopher B. Galvin, Keith J. Bane, Walter Keating, Ed Hughes, and Ernst Kramer, Counter–Defendants.

**Docket Nos. 02–7566, 02–9302.**

United States Court of Appeals, Second Circuit.

Argued: Aug. 5, 2002.

Decided: March 7, 2003.

Robert F. Serio, Gibson, Dunn & Crutcher LLP, New York, New York, for Defendants–Appellants Kemal Uzan et al.

Kenneth M. Bialo (R. Stan Mortensen, James A. Baker, IV, James R. Heavner, Jr., of counsel), Baker Botts L.L.P., Washington, DC, for Defendants–Appellants Kemal Uzan, Cem Cengiz Uzan, Murat Hakan Uzan, Melahat Uzan, and Aysegul Akay.

Howard H. Stahl (Steven K. Davidson, Charles G. Cole, Bruce C. Bishop, Gordon M. Clay, on the brief), Steptoe & Johnson LLP, Washington, DC, for Plaintiff–Appellee Motorola Credit Corporation.

Jason Brown (Michael Donofrio, on the brief), Holland & Knight LLP, New York, New York, for Plaintiff–Appellant Nokia Corporation.

Before: JACOBS, CABRANES, and F.I. PARKER, Circuit Judges.

PER CURIAM.

In Docket No. 02–7566, Defendants appeal from the May 9, 2002 preliminary injunction entered in the United States District Court for the Southern District of New York (Rakoff, *J.*), in aid of Plaintiffs' claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968, and certain Illinois state and common law claims. The plaintiff corporations financed cell-phone and communications networks set up in Turkey by Telsim Mobil Telekomunikasyon Hizmetleri A.S. ("Telsim"), and—following a series of non-payments and serious concern that the loans would not be repaid— are suing persons who are alleged to control Telsim and its onetime chief stockholder, Rumeli Telefon Sistemleri A.S. ("Rumeli Telefon"), and to have impaired collateral by diluting Telsim stock and other maneuvers. Arbitrations concerning the underlying financing transactions were initiated in Switzerland, and have been stayed by the Southern District of New York.

We conclude that the RICO claims based on a third-party's failure to pay on a debt are unripe. This ruling does not strip the district court of all jurisdiction, but it is likely to require reconsideration by the district court of a number of issues, rulings, and orders—no doubt aided by further proceedings being conducted on the merits. We therefore remand for the district court to dismiss the RICO claims, without prejudice to reassertion at some appropriate later time, and to exercise discretion as to whether to retain supplemental jurisdiction over the state law claims. However, we do not vacate the preliminary injunction.

In Docket No. 02–9302, Defendants appeal orders of the district court denying their motions to compel arbitration, staying three arbitrations pending in Switzerland, and denying Defendants' motion to stay all proceedings and the challenged orders pending arbitration. In light of our decision in 02–7566, we remand the issues in 02–9302 to the district court for reconsideration.

*Nostra sponte,* we hereby consolidate these appeals.

**BACKGROUND**

Plaintiff Motorola Credit Corporation ("MCC") is the financing affiliate of Motorola, Inc., which manufactures and services cellular telecommunications systems. Plaintiff Nokia Corporation sells switching technology.

The individual Defendants are several members and one close associate of the prominent Uzan family of Turkey, which controls Telsim, and Rumeli Telefon. Neither Telsim nor Rumeli Telefon is a party to this action. The Uzans also control Defendants Unikom Iletism Hizmetleri Pazarlama A.S., Standart Pazarlama A.S.,

and Standart Telekomunikasyon Bilgisayar Hizmetleri A.S. ("Standart Telekom").

In 1998, MCC entered into several overlapping agreements with Telsim and Rumeli Telefon. MCC loaned Telsim $360 million to purchase cellular infrastructure and equipment from Motorola Ltd. (a MCC affiliate), and $200 million to enable Telsim to acquire a 25–year nationwide cellular license. As collateral, Rumeli Telefon—which then owned approximately 73.5% of Telsim—pledged 51% of Telsim's outstanding shares. In subsequent years, MCC provided additional financing—eventually totaling approximately $2 billion—and the pledged interest was increased to 66% of Telsim's outstanding shares.

Each of these agreements provides that it "shall be governed and interpreted in accordance with the internal laws (without regard to the laws of conflicts) of Switzerland," and that any unresolved dispute "aris[ing]" under the agreement shall be decided, to the exclusion of the ordinary courts, by a three-person arbitration panel in Switzerland in accordance with the International Arbitration Rules of the Zurich Chamber of Commerce.

Also in 1998, Nokia entered into a smaller but similar arrangement with Telsim and Rumeli Telefon. The initial loan was extended by Nokia's bank, ABN–Amro, backed by the credit of Nokia. As security, Rumeli Telefon pledged 5% of Telsim's outstanding shares. In subsequent years, Nokia extended additional financing to Telsim, approximately $800 million in all, and Rumeli Telefon increased the pledged interest to 7.5% of Telsim's outstanding shares.

Each of these agreements provides that it "shall be governed by, and shall be construed in accordance with Swiss law," and that all disputes "relating to" the

agreement shall be resolved by a three-member arbitration panel in Switzerland in accordance with the International Arbitration Rules of the Zurich Chamber of Commerce.

Of these colossal loans from MCC and Nokia, Telsim has repaid approximately $200 million since 1998, and only $5 million since mid–2000.

A special shareholders meeting of Telsim was convened on April 24, 2001. MCC and Nokia contend that it was convened for the purpose of devaluing the pledges of Telsim shares. Defendants contend that the purpose was to protect against a feared loss of control over Telsim. In any event, the shareholders at the meeting tripled the number of outstanding Telsim shares. Although current shareholders were afforded preemption rights to purchase the newly issued shares, Rumeli Telefon (the largest shareholder) waived these rights, and they were transferred to Defendant Standart Telekom (another Uzan-controlled company), which exercised them. Partly as a result of this transfer,[1] Standart Telekom raised its stake in Telsim from 0.32% to 66.48%, while Rumeli Telefon's holding (all of which was pledged to MCC and Nokia) was reduced to 24.54%—severely diluting the value of Plaintiffs' collateral.

Plaintiffs presented additional evidence of the Defendants' maneuvers. For example, the Defendants attempted to alter the voting rights of Telsim's outstanding shares in a way that would have reduced the voting power of the pledged shares and thereby further impaired the collateral. Defendants also allegedly caused false criminal charges to be initiated in Turkey against MCC and Nokia executives, on the claimed grounds that the executives had made "explicit and armed threats" against

---

1. *See infra* note 5.

the Uzans to kill, blackmail, and abduct them, and offered to drop the charges if Plaintiffs deferred payment on the outstanding loans. Defendants also diverted revenue and assets away from Telsim.

Plaintiffs contend that the Defendants' activities throughout this period were intended to thwart Plaintiffs' ability to foreclose on the loans and exercise their rights with respect to the pledged interest.

Before this lawsuit was filed, ABN–Amro began an arbitration against Telsim in Switzerland. In this arbitration, Telsim attempted to reschedule its repayments based on a theory of "economic force majeure." Shortly after this lawsuit was filed, Telsim began an arbitration proceeding in Switzerland against MCC in which Telsim also invoked "economic force majeure" in an effort to reschedule its repayments. On June 7, 2002, Rumeli Telefon commenced two arbitrations against the Plaintiffs in Switzerland, seeking damages and Plaintiffs' compelled consent to the deposit of the pledged Telsim shares with the arbitral forum. On October 15, 2002, the district court issued an opinion granting Plaintiffs' motion to stay the Swiss arbitrations initiated by Telsim and Rumeli Telefon. That stay is among the rulings challenged on the appeal in Docket No. 02–9302, and subject to remand.[2]

In the complaint in the Southern District of New York, both Plaintiffs alleged violations of RICO (Counts I–IV), and sought the imposition of a constructive trust or equitable lien (Count XII). In addition, MCC alleged Illinois state and common law claims (Counts V–VII, XI), and violations of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(4) (Count VIII), and the Electronic Communications Privacy Act, 18 U.S.C. §§ 2511(1)(a), 2701(a)(2) (Counts IX–X).

On May 9, 2002, following a six-day evidentiary hearing, the district court granted the Plaintiffs' motion for a preliminary injunction, which (*inter alia*) directs the Defendants "to deposit into the [district court's] registry . . . the shares of stock of Telsim . . . held by defendant Standart [Telekom] . . . and issued to Standart [Telekom] during a meeting of Telsim shareholders on April 24, 2001, comprising at least 73.5% of the shares of Telsim stock currently outstanding." On May 21, 2002, the district court stated its reasons for that order. *Motorola Credit Corp. v. Uzan*, 202 F.Supp.2d 239 (S.D.N.Y.2002). The district court concluded (insofar as the opinion bears on this appeal) that (1) injunctive relief is available to a private plaintiff bringing a civil action under RICO; (2) Plaintiffs demonstrated a sufficient likelihood of success on the merits of their RICO claims; (3) Plaintiffs had standing to bring their RICO claims against Defendants regardless of whether they pursued remedies against Telsim; (4) MCC was independently entitled to injunctive relief under the Illinois state and common law claims; and (5) the arbitration provisions in the various agreements did not divest the court of jurisdiction. Defendants now appeal.

## DISCUSSION

This case raises a host of unusual questions, and the answers have enormous consequences to the parties and non-parties alike. Today, however, we focus on a single issue that was incorrectly decided by the district court, and that may have impact on many issues confided to the discretion of the district court.

---

**2.** The three Swiss arbitrations that the district court stayed are between and among entities that are party to contractual arbitration agreements, but that are not all present in this lawsuit.

■ "We review a district court's decision to grant ... a preliminary injunction for abuse of discretion." *Int'l Bhd. of Teamsters v. Local Union No. 810*, 19 F.3d 786, 789 (2d Cir.1994). "Abuse of discretion usually consists of clearly erroneous findings of fact or the application of an incorrect legal standard." *Id.* To obtain a preliminary injunction, a plaintiff must show "a threat of irreparable injury and either (1) a probability of success on the merits or (2) sufficiently serious questions going to the merits of the claims to make them a fair ground of litigation, and a balance of hardships tipping decidedly in favor of the moving party." *Time Warner Cable v. Bloomberg L.P.*, 118 F.3d 917, 923 (2d Cir.1997).[3]

■ The district court determined that Plaintiffs "are substantially likely to succeed on their RICO claim under Count III." *Motorola*, 202 F.Supp.2d at 248. Necessary to this determination was the court's conclusion that Plaintiffs had standing to bring their RICO claims and to seek injunctive relief based on those claims. We conclude that, under *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 768 (2d Cir.1994), the Plaintiffs lack statutory standing under RICO because their claims are unripe. Although the district court determined that MCC is also entitled to the preliminary injunction based on its Illinois state and common law claims, the dismissal of the RICO claims has potential bearing on the district court's exercise of supplemental jurisdiction over the non-federal claims. We therefore remand for the district court to decide, under 28 U.S.C. § 1367(c), whether it will retain jurisdiction over the state law claims.

■ Under RICO, "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court." 18 U.S.C. § 1964(c). To satisfy RICO's standing requirements, a plaintiff must demonstrate, "(1) a violation of section 1962; (2) injury to business or property; and (3) causation of the injury by the violation." *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 23 (2d Cir.1990). In *First Nationwide*, this Court considered a bank's RICO claim arising out of fraudulently induced loans. We held that "to the extent [the bank's] complaint is predicated on loans that have not been foreclosed, its claims are not ripe for adjudication because it is uncertain whether [the bank] will sustain any injury cognizable under RICO." *First Nationwide*, 27 F.3d at 767.

■ Our holding in *First Nationwide* rested on the general principle that "a cause of action does not accrue under RICO until the amount of damages becomes clear and definite." *Id.* at 768. The "clear and definite" amount of damages suffered by a secured creditor who is fraudulently induced to make a loan and seeks to recover the value of the loan itself, "cannot be established until it is finally determined whether the collateral is insufficient to make the plaintiff whole, and if so, by how much." *Id.* That is because the RICO damages are netted against recovery obtained from collateral and other sources:

> Because the fraud defendant is not liable for all losses that may occur, but only for those actually suffered, only after the lender has exhausted the bargained-

---

**3.** It is said that a plaintiff who seeks a "mandatory" injunction, rather than a "prohibitory" injunction, must demonstrate a "clear" or "substantial" likelihood of success. *Beal v. Stern*, 184 F.3d 117, 122–23 (2d Cir.1999).

The district court expressed doubts that MCC and Nokia were seeking mandatory injunctive relief (not often an easy distinction to draw), but concluded that the heightened standard would be satisfied if triggered.

for remedies available to it can the lender assert that it was damaged by the fraud, and then only to the extent of the deficiency.

*Id.* In short, "a plaintiff who claims that a debt is uncollectible because of the defendant's conduct can only pursue the RICO treble damages remedy after his contractual rights to payment have been frustrated." *Id.* We therefore concluded that until the secured creditor foreclosed on the loans, the creditor's claims were not ripe for suit. *Id.* at 769.

It is undisputed that Plaintiffs have not foreclosed on the loans at issue here, and that arbitrations are pending in Switzerland that concern the same underlying transactions. The district court undertook to distinguish *First Nationwide* in the following terms:

> In *First Nationwide*, ... the plaintiff sought to bring a RICO claim against the very borrower on whose collateral the plaintiff had not yet fully foreclosed and as to whom ordinary collection proceedings were far from completed. Here, by contrast, the borrower (Telsim) is not a party at all, and the named defendants, who are accused, *inter alia*, of fraudulently inducing the plaintiffs to extend the $2.7 billion in loans and of diverting it to their benefit, are independently liable for this known and certain sum, regardless of whether plaintiffs pursue their alternative remedies against Telsim or not.

*Motorola*, 202 F.Supp.2d at 249.

We think that this distinction is invalid. True, the borrower (Telsim) is not a party here, and this is not a contract action. It is likewise true that the present claims are alleged under a wholly distinct theory (fraud) that would render Defendants liable independently of Telsim. But the RICO damages sought are in respect of a loss that would be abated to the extent

that: Plaintiffs realize value on the collateral; Plaintiffs recover in the Swiss arbitrations; or the size of the debt on the underlying contracts, or the obligation to pay it, is affected by any ruling on Telsim's defenses in the Swiss arbitration that is binding and enforceable. These contingencies, and other conceivable contingencies, remain. "[T]he fraud defendant is not liable for all losses that *may occur*, but only for those *actually suffered*." *First Nationwide*, 27 F.3d at 768 (emphases added). Therefore, "the loss" suffered on past-due loans as to which Plaintiffs have "not finally foreclosed cannot yet be determined. Only when [Plaintiffs'] actual loss becomes clear and definite will the claims be ripe for suit. Until that time, [Plaintiffs] lack[ ] standing under RICO to assert claims as to those loans." *Id.* at 769.

The district court's reliance on *GICC Capital Corp. v. Technology Finance Group, Inc.*, 30 F.3d 289 (2d Cir.1994), and *In re Merrill Lynch Partnerships Litigation*, 154 F.3d 56 (2d Cir.1998), is misplaced. The plaintiff in each case was unsecured, so there was no collateral on which to foreclose, or any other contractual remedy. As we stated in *In re Merrill Lynch*:

> *First Nationwide* [is] inapplicable in this case. [It] hold[s] that when a creditor alleges he has been defrauded RICO injury is speculative when contractual or other legal remedies remain which hold out a real possibility that the debt, and therefore the injury, may be eliminated or significantly reduced. The RICO claim is, thus, not ripe until those remedies are exhausted and the damages are clear. . . . As investors have no contractual or other legal remedies which could assuage the injury [in this case], the amount of damages was "clear and definite," and the injury investment.

*In re Merrill Lynch*, 154 F.3d at 59. Moreover, the issue in *GICC Capital* was whether the plaintiff had established proximate cause so as to satisfy RICO standing, 30 F.3d at 292, and the discussion of RICO injury in *In re Merrill Lynch* pertained to a statute-of-limitations issue, 154 F.3d at 58–59. In any event, neither case impairs the rule enunciated in *First Nationwide*.

It may be that the arbitration is a forlorn hope for MCC and Nokia, and that, in any event, the collateral will yield little of value. But the arbitration does not cease to be a possible influence (negotiated by contract) on the amount of loss simply because the district court has stayed it. Certainly, the district court cannot in that way force the RICO claim to ripen.

■ Because Plaintiffs lack RICO standing to assert claims based on a Telsim's failure to pay on a debt, those claims must be dismissed, without prejudice to reassertion at some appropriate later time. This dismissal also implicates the district court's subject matter jurisdiction. In *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113 (2d Cir.2003), we recently explained that a plaintiff's "lack of statutory standing [under RICO] does not divest the district court of original jurisdiction." *Id.* at 129. Thus, although the plaintiffs' RICO claims in that case were properly dismissed, "[t]he district court had original jurisdiction to support the exercise of supplemental jurisdiction over the ... plaintiffs' state-law claims." *Id.* We then vacated the district court's dismissal of the plaintiffs' state law claims for lack of jurisdiction, and remanded for a determination of whether to exercise supplemental jurisdiction.

We recognize that the district court has already exercised supplemental jurisdiction over MCC's state law claims, and referenced those claims as additional support for the injunction. However, the dismissal of the RICO claims alters things in a way that justifies reconsideration of the injunction, the sufficiency of grounds for issuance as well as the terms of an injunction, if issued. Among other considerations, the sole remaining federal claims are minor compared to the now-dismissed RICO claims, both in terms of scope and in terms of relief.

In light of this changed landscape, we remand this case to the district court for it to decide whether to retain supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(c). Given the district court's conclusion (which we do not now address) that, with respect to MCC, the state law claims provide an independent basis for the preliminary injunction, we do not vacate the preliminary injunction; but our ruling is without prejudice to any ruling we may make on any relief (or denial of relief) that results from ongoing additional proceedings.[4]

While the mandate of this Court leaves the injunction intact, the issuance of the mandate naturally ends the November 27, 2002 Order of this Court staying the imposition and accrual of fines against the De-

---

4. Nokia did not join in alleging all of MCC's state law causes of action. However, Nokia's allegation of a Constructive Trust/Equitable Lien cause of action (it is unclear whether that claim is based on Illinois or New York law) might provide an alternative basis for upholding the preliminary injunction in aid of Nokia. *See, e.g., Hurst v. Papierz*, 16 Ill. App.3d 574, 306 N.E.2d 532, 537–38 (1973); *Rolnick v. Rolnick*, 35 Misc.2d 456, 230 N.Y.S.2d 789, 791 (N.Y.Sup.Ct.1962). We intimate no view as to the viability of the constructive trust or any other claim. It is for the district court to determine, in the first instance, whether Nokia's remaining claims provide a sufficient basis to support the preliminary injunction. Therefore, we also remand, but do not vacate, the portion of the preliminary injunction sought by Nokia.

fendants for non-compliance. However, the schedule of fines established by the district court has long passed, and the district court may (if it determines that the injunction should continue) establish a new, prospective schedule for enforcing compliance.

We note, however, that there appears to be a problem with a term of the present injunction. The injunction directs the Defendants "to deposit into the [district court's] registry . . . the shares of stock of Telsim . . . held by defendant Standart [Telekom] . . . and issued to Standart [Telekom] during a meeting of Telsim shareholders on April 24, 2001, comprising at least 73.5% of the shares of Telsim stock currently outstanding." It would be impossible for Standart Telekom to comply with this order because, as far as the record shows, Standart Telekom only has 66.48% of the currently outstanding Telsim stock. Moreover, of the Telsim stock Standart Telekom does own, only a portion of it (49% of the currently outstanding shares [5]) is traceable to Rumeli Telefon's preemptive rights and, correspondingly, to the stock pledged to the Plaintiffs. The rest of Standart Telekom's Telsim stock was either owned by Standart Telekom prior to the April 24, 2001 meeting, or acquired by exercising the preemptive rights of Telsim stockholders other than Rumeli Telefon.

The preliminary injunction cannot directly reach the Telsim stock still owned by Rumeli Telefon because Rumeli Telefon is not a party to this litigation. Moreover, so far as we can tell from the record, Rumeli Telefon still owns 24.5% of the currently outstanding Telsim stock. Those shares remain subject to the pledge and potentially subject to foreclosure by the Plaintiffs. Additionally, the district court's opinion does not explain the basis for including within the ambit of the preliminary injunction the Telsim shares owned by Standart Telekom that are not traceable to the Rumeli Telefon preemptive rights. To the extent Standart Telekom acquired these shares by exercising the preemptive rights of Uzan-controlled companies other than Rumeli Telefon, it might be appropriate—although we express no view on the viability of this position—for the preliminary injunction to include those shares if, for example, it could be shown that Standart Telekom's acquisition of those shares was part of the fraud. As yet no findings suggest that there has been any such showing. Therefore, although we leave the preliminary injunction in place, we caution that this is an issue to be addressed if, on remand, the court decides to keep the preliminary injunction in place.

We intimate no opinion on any other issues raised in this appeal. The parties may make appropriate motions following the district court's decisions on remand.

## CONCLUSION

For the foregoing reasons, we remand in 02–7566 for the district court to dismiss, without prejudice, Plaintiffs' RICO claims based on Telsim's failure to pay on its

---

**5.** It appears to us that, prior to the shareholders meeting on April 24, 2001, Rumeli Telefon owned approximately 73.5% of the outstanding Telsim stock. At that meeting, the total available shares of Telsim stock were tripled, and Rumeli Telefon was given preemptive rights that would have allowed it to maintain its 73.5% ownership of Telsim. Because Rumeli Telefon declined to exercise those rights (it transferred them to Standart Telekom), its stake in Telsim dropped from 73.5% of all outstanding shares to 24.5% of all outstanding shares. Therefore, Rumeli Telefon gave Standart Telekom preemptive rights that allowed Standart Telekom to acquire 49% of the outstanding shares of Telsim (the difference between the 73.5% to which Rumeli was entitled and the 24.5% it ended up with).

debt, and to decide whether to retain supplemental jurisdiction over the state law claims. In light of this disposition, we remand for reconsideration all issues raised on the appeal in 02–9302. The court may conduct any proceedings not inconsistent with this opinion. In light of these holdings, we deny, as moot, the following motions pending in 02–9302: 1) Plaintiffs' motion to dismiss the appeal; 2) Defendants' motion for a stay of all proceedings in the district court pending appeal; and 3) Defendants' motion for an expedited appeal. Each party will bear its own costs of this appeal.

The mandate shall issue forthwith.